UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:

**ADRIA MM PRODUCTIONS, LTD,**
a Croatian Company,

    Plaintiff,

v.

**WORLDWIDE ENTERTAINMENT GROUP, INC.**, a Florida Corporation,

    Defendant.
_____/

## COMPLAINT

Plaintiff, Adria MM Productions, Ltd. ("AMM"), sues Defendant, Worldwide Entertainment Group, Inc. ("Ultra"), and states:

## INTRODUCTION

1.  AMM has operated the multi-venue electronic music festival known as "Ultra Europe" since July of 2013. The inaugural event attracted over 100,000 electronic music fans. AMM has increased the attendance each successive year. AMM offered additional events under the "Ultra" brand in subsequent years, including "Destination Ultra" and "Ultra Beach." AMM is and has been the exclusive promoter of these "Ultra" branded events in Croatia through an exclusive 5-year license agreement (the "Agreement") with Defendant Ultra, purportedly licensing the trademark **ULTRA EUROPE**.

2.  Following the successful launch of Ultra Europe ("The Festival") in 2013, Ultra amended the Agreement to the further financial detriment of AMM, insisting on, *inter alia*, exclusive approval of vendors, prohibitively expensive staffing arrangements, luxury travel

1

10J470306

arrangements, and additional promotional fees. Ultra repeatedly threatened to cancel the event when AMM did not acquiesce to Ultra's increasingly burdensome demands. AMM, reluctant to disappoint thousands of electronic music fans attending the yearly event, strove to meet each and every demand by Ultra, even when such demands were unreasonable and inconsistent with the parties' intentions when entering into the Agreement.

3. The final Festival under the Agreement was scheduled to take place July 14-17, 2017. Tickets to the festival began selling in October, 2016. After the event was announced, Defendant Ultra proposed a new, five-year exclusive license agreement and demanded that AMM immediately enter into a new agreement under equally oppressive terms as the Agreement and the spirit in which Ultra was attempting to enforce the Agreement. AMM requested a more even-handed agreement be considered. In response, Ultra immediately cut-off AMM's access to social media channels used to promote the Festival, disabled AMM's email accounts used to promote the Festival, prohibited AMM from making any statements to fans or the media, and revoked AMM's rights to promote the Festival in 2017.

4. During this time, AMM repeatedly expressed its desire for the Festival to continue in 2017. Cancelling the already-announced festival would be a disappointment to both fans and local businesses that have begun to depend on the revenue brought in annually. Furthermore, AMM had created the market for the event and had invested hundreds of thousands of Euros into the event. AMM was expecting recoup a profit after such investments, and cancelling the event would be financially disastrous for AMM. Aware of AMM's willingness to acquiesce to almost any of Ultra's demands rather than cancel the event, Ultra continued to demand that AMM execute a new, unreasonable 5-year license agreement.

5. Once AMM realized that Ultra would not allow AMM to proceed under the Agreement and would not allow the 2017 Festival to proceed without AMM executing the new agreement, AMM brought the present action.

## THE PARTIES

6. Plaintiff AMM is a company incorporated under the laws of Croatia with its principal place of business in Croatia.  It is deemed a citizen of Croatia for purposes of 28 U.S.C. § 1332(c).

7. Ultra is a corporation incorporated under the laws of Florida with its principal place of business at 1000 NW 14th Street, Miami, Florida 33136.  It is deemed a citizen of Florida for purposes of 28 U.S.C. § 1332(c).

## JURISDICTION & VENUE

8. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship of AMM and Ultra.

9. The amount in controversy, without interest and costs, exceeds $75,000.00.

10. Venue lies in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b).

11. AMM has retained the law firms of Kozyak Tropin & Throckmorton, LLP and Rubinstein Law in connection with the filing of this action and has agreed to pay counsel a reasonable fee for their services.  AMM is entitled to its reasonable attorneys' fees and costs for bringing this action pursuant to the contracts between AMM and Ultra.

12. All conditions precedent for bringing this action have been fully performed, waived, or excused.

10J470306

## FACTUAL ALLEGATIONS

**The Relationship Between AMM and Ultra**

13.     Ultra is a promoter and organizer of musical events, including the Ultra Music Festival which is an outdoor electronic music festival that takes place annually in Miami. Ultra touts the festival as the world's premier electronic music festival. Ultra Music Festival was founded in 1999 by Ultra's founders Russell Faibisch and Alex Omes. Since Ultra started its first festival in Miami in 1999, it has attempted to grow the "Ultra" brand globally.

14.     In order to grow its purported "Ultra" brand, Ultra has entered into various licensing agreements for the purported use of "Ultra" proprietary marks in numerous countries. Ultra entered into one such agreement, the Agreement, with AMM for use of the proprietary marks in Croatia. Ultra sought out AMM because AMM is one of the largest promotional companies in Croatia and holds exclusive licenses and rights to venues in Croatia and was a successful promoter of musical events in Croatia. The parties entered the Agreement in November, 2012. A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

15.     Pursuant to the Agreement, AMM believed that it was licensing certain proprietary marks owned by Ultra in Europe and, specifically, Croatia. The Agreement states "Ultra hereby grants to AMM, during the term of this Agreement, the non-exclusive and limited right to use, in the Territory, those certain 'Proprietary Marks', namely, *'Ultra Europe,' Ultra Europe:* **Croatia – Split/Hvar Edition**," *"Road To Ultra,"* Ultra's distinctive "**U**" device logo…." (collectively, the "Proprietary Marks"). *See*, Agreement, p. 4. AMM's licensing of the Proprietary Marks was the key to the Agreement, and the Agreement required AMM to pay Ultra substantial sums, including licensing fees and promotional fees for the use of the Proprietary Marks.

16. At the time the parties executed the Agreement, based on representations made by Ultra to AMM, AMM reasonably believed that Ultra owned the mark **ULTRA EUROPE** and other Proprietary Marks in Croatia, and that, in order to use the Proprietary Marks in Croatia, AMM was required to license the Proprietary Marks from Ultra. Moreover, Ultra held itself out as the owner of **ULTRA EUROPE** and the Proprietary Marks and made representations to AMM that, absent a license, AMM could not use the Proprietary Marks in Croatia. AMM relied upon Ultra's representations and entered the Agreement hoping to have a mutually beneficial business relationship with Ultra. The term of the Agreement was for five years, terminating on November 1, 2017, with AMM having the right to renew the Agreement for an additional five-year period. AMM was not represented by counsel when it executed the Agreement and believed instead that the parties would support and accommodate each other as they strove to put Croatia on the global electronic dance music map.

**Performance Under the Agreement**

17. AMM hosted and promoted its first Festival in Croatia in 2013. Despite the initial event being a success, AMM lost money on the event. The primary reason that AMM lost money was because of the unfavorable terms of the Agreement and Ultra's enforcement and interpretation of the Agreement in a manner not anticipated by AMM when it entered the Agreement. Ultra demanded huge, upfront advances be paid in full throughout the relationship. Despite AMM operating the first Festival event in the negative, Ultra, immediately after the completion of the event, sought to change the terms of the Agreement to make it even more favorable to Ultra and more oppressive to AMM, insisting on, *inter alia*, exclusive approval of vendors, prohibitively expensive staffing arrangements, luxury travel arrangements, and additional promotional fees.

10J470306

18. At the time, AMM believed that Ultra had the best interests of both parties in mind and still wanted a mutually beneficial business relationship. Additionally, AMM was committed to growing the Festival and continuing with its valuable business relationships with vendors, hotels, restaurants, ticketing companies, and industry people, including artists. As such, on December 5, 2013, AMM entered into the First Amendment to Trademark License Agreement, attached hereto as **Exhibit B**.[1] Again, at the time the Agreement was amended, AMM was not represented by counsel.

19. The amendments to the Agreement provided more control over the Festival to Ultra—despite AMM holding all responsibility for the execution of the event—and became even more burdensome on AMM and made it even more difficult for AMM to profit from the Festival and its relationship with Ultra. For example, the amendment placed more reporting requirements on AMM, financial and otherwise, imposed draconian penalties on AMM, including high interests on outstanding amounts due and unreasonably acceleration clauses, increased and broadened the scope of promotional fees that AMM would be required to pay Ultra under the Agreement, and increased the travel deposit from $50,000 to $100,000 that AMM was require to pay Ultra.

20. Operating under the oppressive Agreement, AMM continued to promote and host the Festival in 2014, 2015, and 2016. Despite each year being more successful than the last, AMM continued to lose money, while at the same time paying Ultra unreasonable fees and expenses. However, AMM remained committed to fulfilling its obligations under the Agreement and preserving its relationships with fans, vendors, hotels, restaurants, ticketing companies, and industry people, including artists. Ultra knew this and continued to place more and more

---

[1] The Agreement and any amendments thereto are referred to herein as the "Agreement."

10J470306

burdens on AMM to AMM's detriment and making the Agreement commercially unreasonable for AMM to comply.

**Renewal of the Agreement**

21.     After the completion of the Festival in 2016, just after the announcement of the 2017 iteration of the Festival, AMM began selling tickets for the event in order to fulfill its obligation under the fifth and final year of the Agreement.  At that time, knowing that AMM just committed to the Festival in 2017, Ultra proposed a new, five-year exclusive license agreement and demanded that AMM immediately enter into the new agreement.  The new proposed terms were equally oppressive as the commercially unreasonable and financially devastating terms of the Agreement and further violated the spirit of the business relationship between Ultra and AMM.

22.     AMM attempted to negotiate a new agreement that would be beneficial to both parties and contain more even-handed provisions; however, Ultra refused.  Instead of negotiating in good faith to enter into a new agreement, Ultra responded by breaching the Agreement and immediately cutting off AMM's access to social media channels used to promote the Festival in 2017, disabling AMM's email accounts used to promote the Ultra Europe 2017, prohibiting AMM from making any statements to fans or the media, and revoking AMM's "rights" to promote the Festival in 2017.

23.     AMM repeatedly expressed to Ultra its desire for the Festival to continue in 2017 and its willingness to enter into a new, even-handed agreement.  Cancelling the already-announced festival would be a disappointment to both fans and local businesses that have begun to depend on the revenue brought in annually and would be devastating to AMM's sterling reputation in Europe and elsewhere.  Aware of AMM's willingness to acquiesce to almost any of

Ultra's demands rather than cancel the event, Ultra continued to demand that AMM execute a new, unreasonable 5-year license agreement.

24. After AMM would not succumb to Ultra's demands, Ultra sent AMM a notice of default on March 3, 2017 (the "Notice of Default"), purportedly providing AMM with a list of non-exhaustive breaches under the Agreement. The Notice of Default was nothing more than Ultra's continued retaliation against AMM for AMM's refusal to continue with the oppressive business relationship with Ultra and a further attempt to leverage AMM into entering into a new agreement. Again, Ultra knew that AMM strongly desired for the Festival to proceed in 2017 and that, if it did not, AMM would suffer irreparable reputational damage.

25. Recognizing that Ultra was taking all possible steps to prevent AMM from proceeding with the Festival in 2017, determining that AMM was going to suffer irreparable harm at the hand of Ultra, and discovering that, despite the representations to the contrary, Ultra holds no rights in the Proprietary Marks in Europe and, specifically, Croatia, AMM was forced to file this lawsuit to protect its rights.

## COUNT I – Fraud in the Inducement

26. AMM realleges and incorporates herein the allegations in paragraphs 1 – 25 as though fully set forth herein.

27. Ultra made a false statement regarding a material fact relating to the Agreement. At the time AMM and Ultra entered into the Agreement, Ultra held itself out to AMM as the owner of certain intellectual property rights in Europe and, specifically, Croatia, including **ULTRA EUROPE** and the Proprietary Marks.

28. Ultra knew, or should have known, that the statements and representations relating to its ownership of those certain intellectual property rights, including **ULTRA**

8

10J470306

**EUROPE** and the Proprietary Marks, were false at the time it entered into the Agreement because Ultra held no trademark rights in Europe and, specifically, Croatia at the time it entered into the Agreement with AMM.

29. Ultra made the false statements and representations to AMM with the intent to induce AMM to enter into the Agreement and reap substantial, unjustified fees and other benefits.

30. AMM justifiably relied upon the false statements and representations made by Ultra when entering into the Agreement.

31. AMM has been damaged by Ultra's false statements and representations.

## COUNT II – Fraudulent Misrepresentation

32. AMM realleges and incorporates herein the allegations in paragraphs 1 – 25 as though fully set forth herein.

33. Ultra made a false statement regarding a material fact relating to the Agreement. At the time AMM and Ultra entered into the Agreement, Ultra held itself out to AMM as the owner of certain intellectual property rights in Europe and, specifically, Croatia, including **ULTRA EUROPE** and the Proprietary Marks.

34. Ultra knew, or should have known, that the statements and representations relating to its ownership of those certain intellectual property rights, including **ULTRA EUROPE** and the Proprietary Marks, were false at the time it entered into the Agreement because Ultra held no trademark rights in Europe and, specifically, Croatia at the time it entered into the Agreement with AMM.

35. Ultra made the false statements and representations to AMM with the intent to induce AMM to enter into the Agreement and reap substantial, unjustified fees and other benefits.

36. AMM suffered damages acting in reliance on Ultra's false statements and representations.

## COUNT III – Breach of Contract

37. AMM realleges and incorporates herein the allegations in paragraphs 1 – 25 as though fully set forth herein.

38. AMM and Ultra are parties to a contract, the Agreement.

39. Ultra committed numerous material breaches of the Agreement, including cutting off AMM's access to social media channels used to promote the Festival in 2017, disabling AMM's email accounts used to promote the Festival in 2017, prohibiting AMM from making any statements to fans or the media, and revoking AMM's "rights" to promote the Festival in 2017.

40. AMM suffered, and continues to suffer, damages caused by Ultra breaches.

## COUNT IV – Breach of the Implied Covenant of Good Faith and Fair Dealing

41. AMM realleges and incorporates herein the allegations in paragraphs 1 – 25 as though fully set forth herein.

42. AMM and Ultra are parties to a contract, the Agreement.

43. The Agreement contains provisions that are ambiguous.

44. Ultra, through a conscious and deliberate act, fails or refuses to discharge contractual responsibilities that unfairly frustrate the Agreement's purpose and disappoints AMM's expectations by including cutting off AMM's access to social media channels used to

promote the Festival in 2017, disabling AMM's email accounts used to promote the Festival in 2017, prohibiting AMM from making any statements to fans or the media, and revoking AMM's "rights" to promote the Festival in 2017.  Additionally, Ultra has required AMM to solely use its vendor contacts at the Festival, despite AMM being the operator of the Festival, and this is done solely so that Ultra can receive unjustified commissions and AMM's profits will be accordingly decreased.

45. Ultra's breaches deprive AMM of the Agreement's benefits and have resulted in, and will continue to result it, AMM losing substantial amounts of monies, while Ultra reaps unjustified rewards.

46. AMM has suffered, and will continue to suffer, damages resulting from Ultra's breaches of the implied covenant of good faith and fair dealing.

## COUNT V – Equitable Estoppel

47. AMM realleges and incorporates herein the allegations in paragraphs 1 – 25 as though fully set forth herein.

48. At the time AMM entered the Agreement with Ultra, Ultra made numerous representations to AMM relating to its ownership of the Proprietary Marks in Europe and, specifically, Croatia, which was material to the Agreement.

49. After entering into the Agreement, AMM discovered that Ultra holds no rights in the Proprietary Marks in Europe and, specifically, Croatia.

50. When entering into the Agreement, and throughout its performance of the Agreement, AMM relied on Ultra's numerous representations to AMM relating to its ownership of the Proprietary Marks in Europe and, specifically, Croatia.

11

51. As a result of Ultra's representations and AMM's reliance thereon, AMM suffered a detriment by a change in its position, including paying Ultra unjustified monies for the use of the Proprietary Marks in Europe and, specifically, Croatia, when Ultra had no rights in such marks.

## COUNT VI – Rescission (Fraud)

52. AMM realleges and incorporates herein the allegations in paragraphs 1 – 25 as though fully set forth herein.

53. AMM and Ultra entered into a contract, the Agreement.

54. The Agreement was procured by fraud because, at the time AMM and Ultra entered into the Agreement, Ultra held itself out to AMM as the owner of **ULTRA EUROPE** and other certain intellectual property rights in Europe and, specifically, Croatia, including the Proprietary Marks. Such statements and representations were false and Ultra knew, or should have known, that such statements were false.

55. To the extent AMM has received any benefits from the Agreement, it will return such benefits to Ultra.

56. AMM has no adequate remedy at law.

## COUNT VII – Unjust Enrichment

57. AMM realleges and incorporates herein the allegations in paragraphs 1 – 25 as though fully set forth herein.

58. By, *inter alia*, paying substantial fees, commissions, expenses, and other amounts under the Agreement and promoting the "Ultra" brand in Europe, AMM has conferred a benefit on Ultra, who has knowledge thereof.

59. Ultra voluntarily accepted and retained the benefits conferred by AMM.

60. Because AMM provided substantial benefits to Ultra and Ultra provided no corresponding benefit because it held no rights in the Proprietary Marks in Europe, the circumstances render Ultra's retention of the benefits inequitable unless Ultra returns the monies to AMM.

## COUNT VIII – Declaratory Relief

61. AMM realleges and incorporates herein the allegations in paragraphs 1 – 25 as though fully set forth herein.

62. AMM and Ultra entered into a contract, the Agreement. AMM seeks a declaration of rights under the Agreement. Specifically, AMM seeks a declaration that the Agreement is void and of no effect because of unilateral mistake, unconscionability, and lack of consideration, all relating to Ultra's false statements regarding its ownership of certain intellectual property rights in Europe and, specifically, Croatia, including the Proprietary Marks.

63. At the time AMM entered the Agreement, AMM believed that Ultra was the owner of certain intellectual property rights in Europe and, specifically, Croatia, including the Proprietary Marks. This was a mistake. The grant of rights to AMM was the main consideration for AMM entering into the Agreement.

64. There is a bona fide dispute between AMM and Ultra.

65. AMM has a justiciable question as to the as to the enforceability of the Agreement and the existence or non-existence of its rights under the Agreement.

66. AMM is in doubt as to its rights.

67. As such, there is a bona fide, actual, and present need for the requested declaration.

## COUNT IX – Injunctive Relief

68. AMM realleges and incorporates herein the allegations in paragraphs 1 – 25 as though fully set forth herein.

69. The actions taken by Ultra as alleged above and incorporated herein have caused and will cause AMM irreparable and immediate injury, loss, and damages, for which there is no adequate remedy at law.

70. AMM has a clear right to the relief sought under applicable law, and therefore a likelihood of success on the merits of this action and interest in the subject matter of this lawsuit.

71. No adequate remedy at law exists that can fully protect AMM from damages it will suffer if Ultra is permitted to prevent AMM from proceeding with the Festival in 2017 or, alternatively, attempting to enforce the unenforceable non-competition provision in the Agreement.

72. The balance of equities favors AMM and is in the public interest.

73. The relief sought by AMM is necessary to prevent and restrain the ongoing violations of applicable law as described herein.

## COUNT X – Tortious Interference with Business Relationships

74. AMM realleges and incorporates herein the allegations in paragraphs 1 – 25 as though fully set forth herein.

75. AMM has numerous business relationships relating to the Festival, including with vendors, transportation companies, hotels, restaurants, ticketing companies, ticket holders, and industry people, including artists, many of which currently hold deposits.

76. Ultra has knowledge of such business relationships because Ultra has been involved with the Festival since 2013.

77. Ultra has intentionally and unjustifiably interfered with these relationship by, *inter alia*, cutting off AMM's access to social media channels used to promote the Festival in 2017, disabling AMM's email accounts used to promote the Festival in 2017, prohibiting AMM from making any statements to fans or the media, and revoking AMM's "rights" to promote the Festival in 2017, all in the hopes of preventing AMM from proceeding with the Festival in 2017. AMM's business relationships have already been damaged and, if the Festival does not proceed in 2017, AMM's business relationships will be irreparably damaged.

78. AMM has suffered damages from Ultra's intentional and unjustified interference with AMM's business relationships.

## **PRAYER FOR RELIEF**

**WHEREFORE**, AMM demands judgment against Ultra as follows:

a) compensatory damages in an amount to be determined at trial, for the frauds committed by Ultra;

b) compensatory damages in an amount to be determine at trial, for Ultra's breaches of the Agreement;

c) punitive damages;

d) rescission of the Agreement;

e) a declaration that the Agreement is void;

f) injunctive relief preventing Ultra from enforcing any provisions of the Agreement against AMM, including the non-competition provisions;

g) all costs of this action, including reasonable attorneys' fees and costs; and/or

h) such other and further relief as this Court shall deem just and proper.

10J470306

Dated: April 28, 2017                    Respectfully submitted,

**KOZYAK TROPIN & THROCKMORTON, LLP**
2525 Ponce de Leon Blvd., 9th Floor
Miami, Florida 33134
Tel.: 305-372-1800
Fax: 305-372-3508
Email: gam@kttlaw.com
         vfa@kttlaw.com

By: /s/ Vincent F. Alexander
       Gail A. McQuilkin
        Fla. Bar No. 969338
        Vincent F. Alexander
        Fla. Bar No. 68114

       -and-

       Yano Rubinstein, Esq.
       **Rubinstein Law**
       660 4th Street #302
       San Francisco, CA 94107
       Tel.: 415-967-1969
       Fax: 415-236-6409
       Email: yano@rublaw.com

16

10J470306