# Exhibit A

CROATIA 2012

## PROMOTIONAL AGREEMENT

This AGREEMENT ("Agreement") shall be made and effective on the 2nd day of November, 2012 (the "Effective Date") by and among the Worldwide Entertainment Group, Inc., a Florida corporation with principal offices located at 1000 NW 14th Street, Miami, FL  33136, USA, hereinafter referred to as "ULTRA," and

| | |
|---|---|
| Name: | ADRIA MM PRODUCTIONS, LTD. |
| Address: | Banjavciceva 22, 10 000 Zagreb, Croatia |
| Phone: | |
| Tax Information: | Tax No.  05311074805 |
| E-mail Address: | j.basic@mpg.hr |
| Designated Representative: | (collectively, "AMM"). |

In consideration of the mutual promises, benefits and agreements specified herein and for all other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, AMM and Ultra agree as follows:

### 1.     DEFINITIONS

The below capitalized terms shall have the meanings ascribed to them and the meanings shall be equally applicable to both the singular and plural forms of the terms defined.

a.     "Additional Promotional Fee" shall have the meaning ascribed to it in Section3.a.

b.     "Artist" shall mean musicians, DJs and all other performance artists contemplated to appear at the Event.

c.     "Artist Budget Minimums" shall have the meaning ascribed to it in Paragraph 10.c.

d.     "Artist Fee" shall mean the amounts to be paid to Artists for their respective performance at any Event as confirmed by Ultra and as approved by AMM, including applicable booking and related fees.

e.     "Budget Minimums" shall mean the minimum amount AMM shall be required to set aside and spend on the applicable Event.

f.     "Domain Name(s)" shall have the meaning ascribed to it in Paragraph 15.a.

g.     "Due Diligence Trip(s)" shall have the meaning ascribed to it in Paragraph 16.b.

h.     "Effective Date" shall mean the date first above written.

i.     "Event(s)" shall collectively refer to the following: "Music Festival(s)" shall generally refer to a multi-day highly-attended outdoor music festival produced in the Territory, with a maximum of 3 stages and branded as "ULTRA EUROPE," "ULTRA EUROPE: CROATIA – SPLIT/HVAR EDITION," and/or any other title or brand as determined by Ultra; and "Club Events" shall have the meaning(s) ascribed to it by Ultra, and shall generally refer to any indoor Event including those branded as "ROAD TO ULTRA" or any other title or brand as determined by Ultra, including certain Club Events produced in Hvar and some (but not all) of which may be limited to no more than 2 stages (the "ULTRA BEACH EVENTS").

j.     "Expenses" shall mean all actual and incurred expenses associated with the licensing, talent

2                                                                          11/02/12 EXECUTION

**CONFIDENTIAL**                                        WEG 002156

CROATIA 2012

acquisition, management, production and promotion of the Event(s), whether foreseeable or not, including costs, fees, settlements, obligations, Taxes, as well as production costs, marketing and advertising costs, security costs (i.e., wristbands, fencing), website costs (i.e., web design, production, maintenance, hosting and the procurement and maintenance of a Domain Name(s)), promotion costs (i.e., ticket printing, third party ticket sales), transportation costs, travel and entertainment expenses (i.e. hotel, airfare), and certain operational costs directly or indirectly relating to the production of the Event(s), including tent and Venue rentals, lighting rentals, sound equipment and system rentals, stage rentals, as well as, stage installation and dismounting, generator rentals, performers and/or Artists, performers' airfares, Event staff, licensing, governmental permits, pre-Event and post-Event expenses, proposals, sales kits, legal, accounting and other professional fees and costs, including fees and costs associated with registering trade names and/or marks, project manager, AV (screen rentals and VJs), supplies and materials, portable bathroom rentals, cleanup crew, public relations services, decoration, performers' wardrobes, lobbying, insurance, VIP area set up, pipe and drape, artwork, barricades, staff shirts and tags, third-party e-mail drops, telemarketing, restoration costs to Venue and other costs necessary and related to the Event(s) as well as any indebtedness related to any Event, contingent, fixed or otherwise, heretofore, now or from time to time hereafter owing, due and payable, however evidenced, created, incurred, acquired or owing, and however arising, whether under written or oral agreement, by operation of law or otherwise, shall be included unless otherwise specified.

k.     "Final Accounting" shall have the meaning ascribed to it in Paragraph 10.d.

l.     "First Inquiry" shall mean any inquiry made by Ultra after consultation with, on behalf of, or as directed by AMM with respect to potential talent acquisition for any upcoming Event(s).

m.     "Governmental Authorization(s)" shall mean any approval, consent, license, permit, waiver or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any applicable legal requirement.

n.     "Governmental Body(ies)" shall mean any (i) federal, state, national, local, municipal, foreign or other governmental or administrative entity, agency or authority; (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal); and (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, over AMM or Ultra.

o.     "Gross Ticket Sales" shall mean all monetary receipts derived directly or indirectly from the sale of tickets, passes or admission, viewing or entry of any kind before, on, or after the day of the applicable Event including all surcharges, facility fees, restoration fees or other Venue fees.

p.     "Immigration Opinion" shall have the meaning ascribed to it in Paragraph 8.k.

q.     "Marketing Budget Minimums" shall have the meaning ascribed to it in Paragraph 9.a.

r.     "Other Marketing Value" shall have the meaning ascribed to it in Paragraph 9.a

s.     "Production Trip(s)" shall have the meaning ascribed to it in Paragraph 16.c.

t.     "Promotional Fees" (or sometimes "Annual Base Fees") shall mean that fees owed to Ultra by AMM pursuant to the terms of this Agreement, including those enumerated in Section 3.

u.     "Proprietary Marks" shall mean those proprietary marks described in Paragraph 2.a of this Agreement as well as any other name, trade name, trademark, service mark, brand, corporate identity or logo so designated and whether now existing or hereinafter created by Ultra or its affiliates or designees.

3                                              11/02/12 EXECUTION

**CONFIDENTIAL**                                WEG 002157

CROATIA 2012

v.      "Refund Program" shall have the meaning ascribed to it in Paragraph 11.o.

w.      "Royalty" shall have the meaning ascribed to it in Paragraph 13.b.

x.      "Sponsorship Value" shall have the meaning ascribed to it in Paragraph 12.b.

y.      "Tax Opinion" shall have the meaning ascribed to it in Paragraph 8.e.

z.      "Taxes" shall mean any fees, levies, liens, amounts, tariffs, duties and/or other charges, liabilities, claims, encumbrances, interests in property owned or leased by the parties or any other indebtedness due to a Governmental Body in connection with, as a result of, or in any way relating to, the production of the applicable Event including, without limitation, value added tax (VAT), sales tax, use tax, excise tax, payroll tax as well as taxes on or relating to income, capital, insurance premium, social security, or unemployment insurance.

aa.     "Term" shall have the meaning ascribed to it in Paragraph 5.a.

bb.     "Termination Fee" shall have the meaning ascribed to it in Paragraph 20.g

cc.     "Territory" shall have the meaning ascribed to it in Paragraph 4.a.

dd.     "Ultra Affiliate" shall mean either (i) an affiliate or subsidiary of Ultra, whether now existing or hereinafter created, and their respective successors and assigns, or (ii) any entity designated as a Ultra Affiliate by Ultra.

ee.     "Ultra Products" shall have the meaning ascribed to it in Paragraph 13.a.

ff.     "UMF TV" shall have the meaning ascribed to it in Paragraph 14.a.

gg.     "UMF Videos" shall have the meaning ascribed to it in Paragraph 14.a.

hh.     "Venue" shall have the meaning ascribed to it in Paragraph 7.a.

ii.     "Work(s)" shall have the meaning ascribed to it in Paragraph 14.f.

jj.     "Working Budget" shall have the meaning ascribed to it in Paragraph 10.b.

2.      GRANT OF RIGHTS

a.      Grant of Rights.  Ultra hereby grants to AMM, during the Term of this Agreement, the non-exclusive and limited right to use, in the Territory, those certain Proprietary Marks, namely, "*Ultra Europe*," *Ultra Europe: Croatia – Split/Hvar Edition*," "*Road To Ultra*," Ultra's distinctive "U" device logo or any other mark deemed appropriate by Ultra for time to time (the "Proprietary Marks") as set forth in Composite Exhibit "A," which is subject to change upon notification by Ultra to AMM.  This grant of rights subject to, and conditioned upon, AMM's performance of all of its obligations hereunder. All rights granted herein by Ultra to AMM to use the Proprietary Marks apply only to use in connection with the Event(s) herein.  AMM shall not, at any time directly or indirectly, promote its own, or any other name, trade name, trademark, service mark, brand, corporate identity or logo along with the Proprietary Marks.  AMM shall use the Proprietary Marks exclusively to name and promote the Event(s) and acknowledges that Ultra and/or its affiliates are the exclusive owner(s) of the names, trademarks, service marks, brands, logos and/or identification schemes, standards, specifications and other concepts embodied within its Proprietary Marks as set forth in Exhibit "A."  AMM acquires no right, title or interest in the Proprietary Marks or in any other trade names, trademarks, trade dress, service marks, logos or names owned or used by Ultra and/or its affiliates.  Any and all goodwill associated with the use of the Proprietary Marks shall inure exclusively to the benefit of Ultra, its subsidiaries, affiliates or assigns as the case may be.  Upon the expiration or termination of this Agreement, no monetary amount

4                                    11/02/12 EXECUTION

**CONFIDENTIAL**                    WEG 002158

CROATIA 2012

shall be assigned, transferred or paid by Ultra as attributable to any goodwill associated with the Proprietary Marks.

b.      **Limited Purpose.** AMM shall only produce, sponsor, organize and/or promote the Event in the Territory and shall not directly or indirectly use any other name, trade name, trademark, trade dress, service mark, corporate identity, brand or logo in connection with any festival, concert, party, nightclub event or any other entertainment-related event except as expressly provided herein.

c.      **Expiration or Termination; No Residual Rights.** Upon the expiration or early termination of this Agreement, AMM shall not acquire any right, title or interest in the Proprietary Marks. All marks used, registered or to be registered in the Territory containing "Ultra" or the "U" design shall be the exclusive property of Ultra regardless of any costs incurred by AMM herein. In the occasion of an infringement claim, AMM shall notify Ultra in writing within 5 days of AMM's receipt of such notice of claim, potential claim or threat of litigation, and Ultra shall have full authority and control over any litigation and settlement terms.

3.      FINANCIAL TERMS; EVENTS

a.      **Monetary Values; Currency.** All monetary values herein are expressed, and shall be paid, in Euros ("€") unless otherwise specified. All Promotional Fees, Additional Promotional Fees, Travel Deposits and liquidated damages shall be paid and remitted to Ultra in U.S. Dollars. Although Artist Budget Minimums and Marketing Budget Minimums are expressed in U.S. Dollars in this Agreement, AMM shall be considered to have met its obligations if such amounts are paid in Euro equivalents. AMM shall at all times, be responsible for any and all conversion costs, if any, arising from or relating to any of its payments obligations set forth in this Agreement or from payments either remitted or obligated to be remitted hereunder.

b.      **Promotional Fees** shall include the fees due under this Section 3.

c.      **Base Fees For Festival Events.** AMM shall pay Ultra, net of Taxes, and on a non-refundable basis, the applicable annual Base Fees plus all applicable Additional Promotional Fees relative to FESTIVAL EVENTS as set forth below:

| PROMOTIONAL FEE | | ADDITIONAL PROMOTIONAL FEE | |
|---|---|---|---|
| Base Year | Base Fee | % Per Ticket Issued [25,000-30,000] | % Per Ticket Issued [30,000+] |
| Year 1 | $ 150,000 | 5% | 7.5% |
| Year 2 | $ 187,500 | 5% | 7.5% |
| Year 3 | $ 234,375 | 5% | 7.5% |
| Year 4 | $ 292,969 | 5% | 7.5% |
| Year 5 | $ 366,211 | 5% | 7.5% |

d.      **Due Dates.** The Year 1 Promotional Fee ($150,000) shall be due and payable, as follows: 50% or $75,000 shall be paid upon the execution of this Agreement and the balance or $75,000 shall be paid before **FEBRUARY 21, 2013**. Subsequent Promotional Fees shall be due and payable each year as follows: 50% of the applicable annual Promotional Fee shall be due the earlier of (i) upon First Inquiry or (ii) within 180 days prior to the next scheduled Event. The remaining 50% shall be due and payable within 120 days prior to the next scheduled Event.

5                                                         11/02/12 EXECUTION

**CONFIDENTIAL**                              WEG 002159

CROATIA 2012

e.     **Additional Festival Promotional Fee.**  AMM shall pay Ultra for each Music Festival and net of Taxes, 5% of all ticket revenue generated between 25,000 and 30,000 tickets issued and 7.5% of all ticket revenue generated from 30,001 tickets issued (the "Additional Promotional Fee").   Such Additional Promotional Fee shall, at all relevant times, be deemed held in trust for the sole benefit of Ultra by a designated trust company or other designee of Ultra and remitted to Ultra by wire transfer no later than 10 business days following the last scheduled day of the applicable Event together with a complete beginning and ending inventory and accounting of all sales.

f.     **Application of Ticket Sales.**  For purposes of computing the Additional Promotional Fees relative to each Music Festival Event, and subject to the terms of Paragraph 3g, ticket counts shall be applied as follows using the following order: the lowest priced tickets shall first be applied toward reaching the first tier of 25,000-30,000 tickets issued and with the higher priced tickets being applied toward the second tier of 30,000+ tickets issued.

g.     **Ticket Revenue Minimum Guarantee.**  Notwithstanding any provision contained herein to the contrary, Ultra shall in no event be paid less than €2.00 per ticket issued over 25,000 with the lower priced tickets being applied first for each Music Festival Event produced.

h.     **ULTRA BEACH EVENTS.**  As part of the Music Festival Event described in this Section, AMM shall additionally produce certain ULTRA BEACH EVENTS including in Year 1, the ULTRA BEACH EVENTS, which shall be produced on July 14, 2013.

i.     **Payments.**  Notwithstanding any provision contained herein to the contrary, the parties acknowledge and agree that any amounts due to Ultra under this Agreement (including Promotional Fees, Additional Promotional Fees, Sponsorship Fees and Ultra Product Fees/Royalties) shall be net of any applicable Taxes. IF ANY AMOUNTS DUE TO ULTRA UNDER THIS AGREEMENT IS NOT TIMELY PAID, THE GRANT OF RIGHTS TO USE, OR TO CONTINUE USING THE PROPRIETARY MARKS DESCRIBED IN SECTION 2 AND ANY OTHER INTELLECTUAL PROPERTY USE OR LICENSE PERMITTED BY ULTRA SHALL BE IMMEDIATELY SUSPENDED OR TERMINATED WITHOUT FURTHER NOTICE OR DEMAND AT ULTRA'S SOLE AND ABSOLUTE OPTION.  THE FOREGOING SHALL BE IN ADDITION TO ALL OTHER ULTRA REMEDIES PROVIDED HEREUNDER OR OTHERWISE AVAILABLE BY LAW TO ULTRA.

j.     **Expenses.**  AMM shall be solely responsible for all Expenses incurred in the licensing, management, promotion and production of the Event(s), whether foreseeable or not and regardless of whether such Expenses are included in the budgets described in Section 10.

k.     **Net of Taxes.**  Notwithstanding any provision contained herein to the contrary, all fees and payments due Ultra under this Agreement shall be net of Taxes.

4.     TERRITORY

a.     **Territory.** Subject to the terms and conditions set forth in this Section 4 and during the Term of this Agreement, the territory shall, (1) on an exclusive basis be CROATIA and (2) EUROPE, on a non-exclusive basis, as specified on Exhibit H, which is attached hereto and made a part hereof.

b.     **Ultra's Restrictive Covenant.**  Subject to the applicable terms of this Agreement, including Paragraphs 4c and 4d below, Ultra shall not produce any Music Festivals in Europe during the period commencing on the Effective Date and continuing through the end of Year 3.

6                                      11/02/12 EXECUTION

**CONFIDENTIAL**                          WEG 002160

CROATIA 2012

c.     **AMM's Right of First Refusal.** In Year 4, AMM shall have a right of first refusal respecting new European markets, to wit: if Ultra receives bonafide offers to produce future Events within the applicable Territory, Ultra shall provide AMM with notice in writing of the terms of any such bonafide third party offers ("The Offer"), which is acceptable to Ultra and AMM shall have 10 calendar days to exercise, in writing, its right of first refusal on the terms of The Offer. Ultra and AMM shall, but in no event later than 30 days thereafter, enter into a marketing agreement or other document requested by Ultra memorializing AMM's exercised right of first refusal. If a separate agreement is executed, this Agreement and the newly executed agreement shall contain and/or be deemed to contain a cross default provision wherein a default under one agreement shall also be deemed a default in the other. Beginning in Year 5, and notwithstanding AMM's right of first refusal, Ultra shall have the absolute right to produce Events within the Territory, except for Croatia.

d.     **Excluded Territories.** Ibiza, Spain shall be excluded from the Territory, and from the terms, conditions and restrictions specified in paragraphs 4b and 4c above.

e.     **Club Events.** To the extent that the parties enter into a separate "Road To Ultra" or similar club event agreement, AMM's performance under such other agreement shall not constitute a violation of this Section 4 relative to Territory and/or the exclusivity thereof.

## 5.   TERM

a.     **Term.** The term of this Agreement shall commence upon the Effective Date and shall expire on November 1, 2017, unless sooner terminated by Ultra (the "Term").

       Year 1 shall commence on the Effective Date and shall terminate November 1, 2013.
       Year 2 shall commence November 2, 2013, and shall terminate November 1, 2014.
       Year 3 shall commence November 2, 2014, and shall terminate November 1, 2015.
       Year 4 shall commence November 2, 2015, and shall terminate November 1, 2016.
       Year 5 shall commence November 2, 2016, and shall terminate November 1, 2017.

b.     **Renewal.** AMM shall have the right to renew the Term for an additional 5-year period on condition that AMM performs its obligations hereunder as agreed. In the event that the Term of this Agreement is renewed, the renewal term shall also be referred to as the "Term."

## 6.   EVENT DATES; EVENT MINIMUMS

a.     **Selection of Event Dates.** Except with respect to Year 1, by **SEPTEMBER 1** of each year during the Term, AMM shall provide written notice to Ultra of AMM's election and definitive commitment to produce upcoming Events and shall propose (i) Event dates for that year, and (ii) venues, both of which shall be subject to Ultra's approval. Failure by AMM to comply with the foregoing shall constitute a material breach hereof. Subject to the terms of this Agreement, the following Event minimums shall apply:

       i.      **Year 1.** In Year 1 of this Agreement, AMM shall collectively produce at least one (1) 3-day Music Festival, which shall be comprised of at least July 12, 2013 and July 13, 2013 at the **SPLIT STADIUM** in Croatia and one (1) **ULTRA BEACH EVENT** on Wednesday, July 14, 2013.

       ii.     **Subsequent Years.** Following Year 1 and throughout the remainder of the Term, AMM shall produce at least one (1) 3-day Music Festival per year and by **SEPTEMBER 1** of each year during the Term, AMM shall be required to provide written notice to Ultra of AMM's election and definitive commitment to produce upcoming Events and shall propose (i) Event dates for that year, and

7                                          12/02/12 EXECUTION

**CONFIDENTIAL**                              WEG 002161

CROATIA 2012

(ii) venues, both of which shall be subject to Ultra's approval. The applicable Promotional Fees for such Event shall be due and payable as follows: 50% of the shall be due the earlier of (i) upon First Inquiry or (ii) within 180 days prior to the next scheduled Event and the remaining 50% shall be due and payable within 120 days prior to the next scheduled Event.

b.      **Related Events.** AMM shall, simultaneously with the execution of this Agreement, enter into a separate agreement governing the production of certain "Road To Ultra" Club Events which are contemplated to occur on the island of Pag during the first week of July, 2013 and in Zagreb during certain winter months.  Any default by AMM, either hereunder or under any other agreement between and/or among AMM and Ultra, or their respective subsidiaries, affiliates or principals, shall, without further notice or demand, also constitute a default and material breach by AMM hereunder.

## 7.      PRODUCTION

a.      **Venue.**  AMM shall, subject to the approval of Ultra, select, secure and lease a venue for each Event, together with all necessary and related facilities (the "**Venue**").

b.      **Venue and Event Access.**  Ultra and its representatives shall, at all relevant times during the Term, have unlimited access to the selected Venues, including during the set up as well as pre-production and post-production times. Access shall be provided to Ultra's representatives and no less than 3 additional agents of Ultra to all areas of the Venue and Event, including offices, ticket rooms and counting rooms. The names of Ultra's representatives shall be submitted to AMM no less than 2 days prior to the applicable Event. During each Event, access to the backstage area shall be restricted to Ultra's and AMM's authorized personnel.

c.      **Licenses, Permits.**  AMM shall procure all Governmental Authorizations from any applicable Governmental Bodies necessary to produce each Event.

d.      **Stage Installation; Set Up; Technical Specifications.**  AMM shall prepare the Venues for each Event and if applicable, provide installation of the stages, spotlights, forklifts, rigging structures, additional sound and lighting reinforcement and any other equipment needed for proper presentation of the applicable Event as specified in the TECHNICAL RIDER, which is attached hereto as **Exhibit "D"** and made apart hereof. AMM shall prepare and submit the Technical Rider to Ultra for Ultra's approval 90 days prior to each applicable Event.  The Technical Rider shall be submitted to Ultra in substantially the form attached hereto as "**Exhibit D-1.**"

e.      **Utilities (Electricity, Water).**  AMM shall procure all utility services, including electrical power and water sources needed for each Event, as well as additional electric, wiring and power facilities.

f.      **Staff; Production Manager.**  AMM shall provide, hire, contract, supervise and pay for all workers for the proper handling of patrons including ticket sellers, ticket takers and ushers. AMM shall also hire, supervise and assign a projector or production manager for each Event, and such manager shall be subject to the approval of Ultra. AMM shall submit the name and qualifications of the manager to Ultra for approval no less than 6 months prior to the production of each Event.  AMM shall engage the manager no less than 5 months prior to the date of each Event.

8

11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002162

CROATIA 2012

### 8.   TALENT

a.   **Artist Bookings.**

  i.   **Bookings, Line-Up, Set Times and Artwork.**  Ultra shall be solely responsible for all Artist bookings, Artist line-up, Artist set times, Artist artwork, Artist ranking and placement in all advertising, media and promotional material.

  ii.   **AMM Approval.**  Prior to the engagement of each Artist, Ultra shall obtain the approval of AMM and the parties shall jointly select and determine the final Artists to be used for each Event.

b.   **Artist Budget Minimums.**  AMM shall, for each Event, maintain the applicable Artist Budget Minimums as set forth in 10.c, unless a lower amount is agreed to in writing by Ultra.  Ultra shall, at all relevant times during the Term, have the right, but not the obligation to unilaterally modify the Artist Budget Minimum on an Event-by-Event basis and from time-to-time during the Term of this Agreement. Ultra shall consider reducing the Artist Budget Minimum if Ultra is satisfied with the line-up procured.  In the event that Ultra agrees to reduce the Artist Budget Minimum, such reduction shall only apply to such specific Event in which the reduction is approved.

c.   **Artist Payment Terms.**  Subject to the terms set forth in Paragraph 10.c, AMM shall pay all Artist Fees in accordance with offers made by Ultra and approved by AMM and shall timely pay directly to each Artist or their designee, the amount required to engage the Artist pursuant to the terms of the Artist confirmation.

d.   **Advancement of Artist Fees.**  Notwithstanding any provision contained either herein or in any applicable Artist Agreement to the contrary, Ultra shall at all times during the Term of this Agreement and in its sole and absolute discretion, have the unilateral right to require AMM to advance to Ultra or its designee any or all Artist Fees.  In such event, AMM shall also be solely responsible for any and all losses sustained by Ultra in exercising its rights hereunder, including bank fees, taxes or currency fluctuations, if any.

e.   **Tax Opinion; Artist Withholding.**  Upon Ultra's request, AMM shall procure and remit to Ultra a written Tax Opinion from a qualified taxation expert, which tax opinion shall include appropriate tax citations and other authority within 7 days of Ultra's request (the "Tax Opinion").  The Tax Opinion shall address any and all Tax obligations of Ultra, AMM and Artists resulting from, or in any way relating to, the Event(s) including value added tax, sales, use, excise taxes, payroll, taxes on or relating to income, capital, insurance premium, social security, or unemployment insurance and any applicable Tax withholding obligations, including those relating to, or resulting from the payment of Artist Fees.  AMM shall be solely responsible for any and all Tax liabilities, including Tax withholding obligations relating to Artist Fees, if any.

f.   **Taxes; Banking.**  AMM shall be solely responsible for (i) collecting, remitting and filing with the appropriate Governmental Body(ies) for each Event, (ii) all Taxes due hereunder and (iii) payment of all amounts due to any Governmental Body.

g.   **Artist Agreement.**  AMM shall enter into, assume and perform all obligations under applicable Artist Agreement(s) and agrees to perform such obligations in accordance with the terms and conditions set forth in the Artist Agreement(s) and confirmation(s), subject to the terms of Paragraph 8d above.

9         11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002163

CROATIA 2012

Ultra shall provide a copy of each executed Artist Agreement to AMM after it is executed and received by Ultra.

h.   **Material Breach; Remedy.**   FAILURE OF AMM TO TIMELY PAY ANY ARTIST IN ACCORDANCE WITH THE TERMS SPECIFIED HEREIN SHALL CONSTITUTE A MATERIAL BREACH HEREUNDER AND SHALL RESULT IN IRREPARABLE HARM TO ULTRA AND ITS BUSINESS RELATIONSHIPS AND REPUTATION. IN SUCH EVENT, AND NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ULTRA SHALL BE EXCUSED FROM ITS OBLIGATIONS HEREUNDER WITHOUT FURTHER LIABILITY TO AMM, IN ADDITION TO ALL OTHER REMEDIES.

i.   **Artist Air and Hotel.**   AMM shall be solely responsible for Artists' air and hotel costs/arrangements, unless otherwise expressly agreed to by the parties.

j.   **Artist Ground Transportation.**   AMM shall be solely responsible for securing and paying for local ground transportation for Artists from the airport to Artists' hotel; from Artists' hotel to the applicable Event and Artists' return to Artists' hotel; and from Artists' hotel back to the airport in a late model, clean and appropriate vehicle(s), unless otherwise specified in the Artist Agreement.

k.   **Artist Travel Visas; Immigration Opinion(s).**   AMM shall be solely responsible for arranging and paying for the cost of applying and processing Artist and Artists' entourages' travel visas, as well as, all third-party processing and expedite fees, if applicable.   AMM shall provide Ultra with all visa requirements 90 days prior to the scheduled Event.  If requested by Ultra, AMM shall procure and remit to Ultra 90 days prior to each Event(s), a written immigration opinion from a qualified immigration expert, which immigration opinion shall include appropriate legal citations and other authority ("**Immigration Opinion**"). The Immigration Opinion shall address any and all immigration and visa requirements of Ultra and Artists resulting from, or in any way relating to, entry into the Territory for business and entry to perform as an Artist.

l.   **Artist Freight Expenses.**   AMM shall cause Artist to pay all freight-related expenses relating to any backline requirements.

m.   **Artist and Ultra Security.**   AMM shall provide and pay for the highest security levels for Artists and Ultra's representatives for each Event and shall submit to Ultra a written security plan 45 days prior to each Event for Ultra's approval.

n.   **Postponement; Cancellation.**   In the event that an Artist's booking fee has been paid and is forfeited due to postponement or cancellation of an Event, AMM shall be solely responsible for contractual fine(s) contemplated in the Artist Agreement, if any.

9.   MARKETING

a.   **Marketing Budget.**   For each Event, AMM shall budget for and spend (in a manner subject to Ultra's approval), a minimum amount for marketing and advertising directly, and actually related to, and primarily focused on, each applicable Event. AMM's Marketing Budget shall be comprised of "cash" and other value deriving from any and all sources, including media buys and support, non-cash contributions, donations, remuneration, goods, services, discounts, commissions, fees, fringe benefits, revenue generated from the sale of donated goods or services or any similar items (collectively "**Other Marketing Value**") which shall collectively be referred to as (the "**Marketing Budget Minimum**").

10

11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002164

CROATIA 2012

b.   Cash and Other Marketing Value.  Subject to the increases set forth in Paragraph 9c, AMM shall be required to contribute both "cash" and Other Marketing Value toward the Marketing Budget Minimum per each Event and which respective contributions shall be increased annually by a rate of 25% per annum.  AMM shall present third-party evaluations of value based on actual marketing and promotional activities relating to the Event to Ultra for its approval and for purposes of contributing to the Other Marketing Value contemplated hereunder.

|        | CASH       | OTHER MARKETING VALUE |
|--------|------------|-----------------------|
| Year 1 | € 100,000  | € 300,000             |
| Year 2 | € 110,000  | € 330,000             |
| Year 3 | € 121,000  | € 363,000             |
| Year 4 | € 133,100  | € 399,300             |
| Year 5 | € 146,410  | € 439,230             |

c.   Additional Days; Budget Increases.  The Marketing Budget Minimum shall increase by 25% for each additional day added to an Event.

d.   Traditional Media.  The Marketing Budget Minimum shall include print advertising, electronic media buys, direct mail expense, e-mail marketing, collateral materials, publicity expenses and any other items mutually agreed upon by the parties for the marketing campaign.  The advertising campaign shall begin on a mutually agreed upon date.

e.   Publicist.  AMM shall, on an annual basis, and in addition to the Marketing Budget Minimum specified, make a publicist contribution in the amount of at least €10,000 upon the presentation of a corresponding proposal or scope of work, which shall outline in reasonable detail the activities to be provided and the associated costs.  Ultra shall collaborate with AMM and shall endeavor to cause such publicist-related proposals and scopes of work to be presented to AMM approximately 180 days prior to the scheduled Event.

f.   Marketing Campaign.  AMM shall develop a marketing campaign, which shall be presented to Ultra for its approval no less than 5 months prior to the Event.

g.   Marketing Plan.  AMM shall submit an Event marketing plan to Ultra, or to a representative designated by Ultra, no less than 5 months prior to the date of each Event and such plan shall be effectuated no less than the earlier of the Event on-sale date or 120 days prior to the Event.

h.   Branding.  The parties shall work jointly on the creative branding elements and any other aspects of the Event(s) related to branding and image.  If parties are unable to agree on a branding, creative, image-related decision, or concept, Ultra shall have final approval of the artwork and marketing medium.

i.   Press Release.  AMM shall not issue any press releases or public statements respecting either any Event or respecting Ultra, its subsidiaries, affiliates, officers, directors or principals, unless and until such press release or public statement has been approved in writing by Ultra in advance.

11

**CONFIDENTIAL**

WEG 002165

CROATIA 2012

10.    BUDGET

a.    Preliminary Budget.  AMM shall prepare and submit to Ultra a preliminary budget for each Event upon the earlier of either (i) within 5 days of First Inquiry, or (ii) 6 months prior to each Event.  The preliminary budget shall set forth every cost which can be reasonably anticipated, including Expenses, fees, Taxes, surcharges and other charges involved with, relating or incidental to, or incurred as a result of, the production of the applicable Event.

b.    Working Budget.  AMM shall submit a working budget to Ultra for Ultra's approval, which shall set forth an itemized summary of estimated Expenses for each Event and shall include every reasonably-anticipated cost and Expense including fees, Taxes, surcharges and other charges involved with, relating to or incidental to or incurred as a result of, the production of the applicable Event (the "Working Budget").  The Working Budget shall be maintained on a periodic basis as specified by Ultra and in a format acceptable to Ultra and shall strictly comply with the Budget Minimums set forth in this Agreement.  Ultra shall have the right, but not the obligation, to cause AMM to modify AMM's proposed Working Budget in order to conform to the Budget Minimums set forth in this Agreement.

c.    Artist Budget.  Subject to the terms set forth in Paragraph 8.b and notwithstanding that AMM and Ultra shall mutually agree upon each Artist Fee and Artist choice, AMM shall nonetheless maintain a minimum talent budget as set forth below for each Music Festival Event as specified below ("Artist Budget Minimums") and the Artist Budget Minimums shall be increased annually by a rate of 10% per annum during the Term (including all Renewal Terms), plus by a rate of 25% for each additional day added to a Music Festival Event.

|        | FESTIVAL    |
|--------|-------------|
| Year 1 | € 500,000   |
| Year 2 | € 625,000   |
| Year 3 | € 781,250   |
| Year 4 | € 976,563   |
| Year 5 | € 1,220,704 |

d.    Final Accounting.  Within 7 days following the conclusion of each Event, AMM shall submit to Ultra, a preliminary summary of costs detailing, among other things, profits, losses and actual Expenses incurred or paid regarding the applicable Event, and within 30 days following the Event, AMM shall furnish Ultra with a final budget detailing actual profits, losses and Expenses regarding the applicable Event (the "Final Accounting").  AMM shall also provide Ultra with supporting documentation relating to the Final Accounting results.

11.    TICKETING

a.    Ticket Sales.  AMM shall be solely responsible for performing all ticketing obligations hereunder, which includes reporting ticket sale information to Ultra, engaging and supervising approved ticketing companies, sequestering ticketing proceeds as needed and administering refunds, if applicable.

b.    Terms and Conditions.  AMM shall provide to Ultra for Ultra's approval, the proposed terms and conditions relating to all Event tickets.  The proposed terms and conditions shall be provided to Ultra in English.

12



11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002166

c.    **Ticket Sale Projections.** Unless Ultra specifies a sooner time frame, AMM shall provide ticket sale projections to Ultra within 5 months prior to each Event for Ultra's approval. The failure by AMM to meet ticket sale projections shall constitute a material breach hereunder. AMM shall report all ticketing information to Ultra in the frequency, manner and format specified by Ultra and such frequency, manner and format may be modified by Ultra from time to time, upon notification by and as determined by Ultra in its sole and absolute discretion.

d.    **Online Ticketing Reports.** AMM shall provide ticketing reports to Ultra on an online and real time basis and in substantially the format set forth in **Exhibit "B,"** including all sales demographics. Ticketing reports shall, at all relevant times, and at a minimum, include complete ticket manifests from all sources and all ticket types. AMM shall also collect and maintain, during the Term of the Agreement, in accordance with applicable laws, all ticketholder information necessary to refund ticket holders in accordance with Section 10.o. If requested by Ultra, AMM shall deliver advanced attendance and sales reports via fax or e-mail to Ultra once every fortnight during the pre-sale of tickets for each Event, as well as, any other information collected and received to be maintained hereunder by AMM. Online ticketing reports shall be provided to Ultra in English.

e.    **Audit.** Ultra shall be entitled to copies of, and shall have the right to conduct an independent audit of, the books and records relating to any Event and an inspection of attendance, box office, tickets and other books and records with respect to the admission receipts, including unsold tickets and stubs of tickets sold during the Event(s). AMM shall maintain all books and records related to the Event for a period of 5 years following the termination or expiration of this Agreement.

f.    **Counterfeit Prevention.** AMM shall ensure the making of all tickets for each Event and shall ensure adequate security and counterfeit protections respecting same, which shall include mandatory scanning and use of a validation system approved by Ultra. AMM shall provide and pay for all box office and ticket sale operation Expenses, including Venue ticket offices, remote outlet sales, telephone sales, internet sales and third-party vendor sales. Unless otherwise specified by Ultra, ticket sales for each Event shall commence no less than 120 days prior to the scheduled Event.

g.    **Ticket Pricing/Scaling.** AMM shall provide to Ultra a written proposal and detailed analysis of ticket pricing for each Event in the marketplace and at the Venue for 2 years prior to each Event, which shall be approved by Ultra. Such detailed analysis must be submitted no less than 5 months prior to the Event and Ultra must pre-approve all ticket pricing.

h.    **Ticketing Companies; Online Sales.** AMM shall propose a reputable and qualified ticketing company, which company shall at a minimum be licensed, insured and bonded. All ticketing companies shall be approved by Ultra for each Event including a ticketing company for all online, retail and on-site/box office ticket sales. AMM shall not be permitted to maintain any direct or indirect ownership or beneficial interest(s) in any ticketing companies engaged to sell tickets for the Events unless expressly approved by Ultra. All online ticket sales shall be conducted by [TO BE DETERMINED BY ULTRA] by means of a link through the domain [TO BE DETERMINED BY ULTRA]. AMM shall deliver to Ultra a true and correct copy of the proposed ticketing agreement in English and shall assign all of its rights, title and interest thereunder to Ultra and shall name Ultra as a third-party beneficiary thereunder, if required by Ultra.

i.    **Ownership Interest.** AMM shall not acquire or maintain any ownership interest in any ticketing companies used hereunder without the express written consent of Ultra and which consent shall be

13



11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002167

CROATIA 2012

withheld, conditioned or delayed in Ultra's absolute discretion.

j.    **No Advancement of Ticket Sale Revenue; Sequestration.** AMM shall not, during Year 1, be permitted to accept—whether directly or indirectly, in full or in part—any advanced ticket sale revenue without the express approval of Ultra, which may be withheld, delayed or conditioned.   During subsequent years, and provided that AMM is not in default of this or any other agreement with Ultra, or its subsidiaries or affiliates, AMM shall have the right to seek advancement of ticket sale revenue subject to Ultra's approval. If Ultra approves either the full or partial release or advancement of ticket sale revenue hereunder, such advanced ticket sale revenue shall, at all times, either be (i) set aside and maintained in a separate bank, escrow or trust account for the sole benefit of ticket holders and Ultra (as solely determined in advanced by Ultra), or (ii) AMM shall procure and maintain Event cancellation insurance, which shall name Ultra or its designee as an additional insured.  AMM also acknowledges and agrees that any monies collected by AMM relative to the Event, but not remitted to Ultra hereunder, shall, at all relevant times, be deemed funds held in trust for the sole benefit of Ultra and such funds shall be deemed fully earned by Ultra without right of offset by AMM.

k.    **No Discounts.** AMM shall not be permitted to discount or make any ticket pricing adjustments without the express approval of Ultra and such consent or approval may be withheld, delayed or conditioned at the sole and absolute discretion of Ultra.

l.    **Complimentary Tickets; Credential Systems.** Complimentary tickets shall be made available to the parties in an amount consistent with good business practice, but not to exceed an allowance of 10% of the gross attendance capacity of the applicable Event. The 10% allowance does not include passes and tickets made available exclusively for media and sponsorship trades.  Issuance of complimentary tickets exceeding the 10% capacity shall require the mutual written permission of both parties.  Ultra shall, notwithstanding anything contained herein to the contrary, be entitled to a minimum of (i) 250 General Admission tickets, and (ii) 250 VIP tickets with 50  AAA credentials for each Event.  Ultra shall also approve all credential systems.

m.    **Third-Party Beneficiary(ies).** The parties acknowledge and agree that Ultra Enterprises, Inc. or its designee shall, in all respects and at all relevant times, be deemed to be a third-party beneficiary(ies) under all agreements entered into during the Term of this Agreement and for the purpose of producing Events by AMM.

n.    **Adequate Supply.** AMM shall have available an adequate supply of tickets for each Event.

o.    **Refunding.** Within 10 days of execution of this Agreement, AMM shall submit to Ultra for Ultra's written approval, AMM's comprehensive, written refund policies and procedures (the "Refund Program"). The Refund Program shall comply with the terms and conditions set forth in Exhibit "G."

12.    SPONSORSHIPS

a.    **Right of First Refusal.** AMM acknowledges and agrees that all Ultra sponsors shall be given a right of first refusal for all Event sponsorships. Ultra sponsors shall further be given the first preference to be the exclusive sponsor in the sponsor's respective business category so long as the amount of sponsorship commitment offered by sponsor is a fair market value, which shall mean an amount commensurate with that paid by a similar brand with similar market share.

b.    **Sponsorship Fees.** Ultra shall have the right, but not the obligation, to seek sponsors for the

14                                           11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002168

CROATIA 2012

applicable Event(s). If Ultra procures a sponsor, AMM shall be required to pay Ultra a commission of 20% of such sponsorship values, which shall include income from all sources, including "cash," "in-kind" contributions, fees, commissions, fringe benefits, integrations, revenue generated from the sale of donated goods or any similar items (collectively "Sponsorship Value"). Subject to the provisions of Paragraph 12c, with regard to sponsors acquired by AMM, AMM shall pay a sponsorship fee equal to the 7.5% of the Sponsorship Value attributable to sponsorships procured by AMM. Sponsorship amounts payable to Ultra shall be exclusive of any Taxes. All AMM sponsors must be approved by Ultra in advance of the applicable Event. AMM shall take all reasonable steps necessary to cooperate with all approved sponsors in compliance with all sponsorship agreements, arrangements and understandings including providing all approved sponsors with reasonable access to the Venue for the applicable Event for setting up all marketing and other required materials and items.

c.      **Sponsorship Fee Waivers.** During Years 1 and 2 of the Agreement only, Ultra shall waive its entitlement to 7.5% of the Sponsorship Value attributable to sponsorships procured by AMM.

d.      **Logos, Generally.** AMM shall have the right to display any sponsor's logo, name, trademarks, symbol, etc. in any place (in, on or around the stage) as it may deem appropriate with Ultra's prior express approval and provided that all licenses, releases and authorizations necessary to use such logo, name, trademarks, symbol shall have been obtained by AMM. Notwithstanding the foregoing, AMM shall adhere to the form, substance and integrity of the Ultra Music Festival brands, wherever displayed, without changing their characteristics and such display/use shall strictly conform to Exhibit "A" hereto.

e.      **Logos, Website.** Ultra shall endeavor to promptly insert all approved sponsorship logos on the applicable Event website after AMM informs Ultra in writing of the execution of a contract with a sponsor. Notwithstanding the foregoing, AMM shall nonetheless be required to obtain all licenses, releases and authorizations necessary to protect Ultra from claims or potential claims based on, among other things, infringement upon any copyrights or trademarks of third parties relative to all artwork, marketing and advertising content.

## 13.      MERCHANDISE

a.      **Ultra Products.** AMM may obtain vendors for manufacture and production of Ultra-branded merchandise bearing one or more of Ultra's—or its affiliate's—Proprietary Marks ("Ultra Products") only after submitting the quantity, design, specifications and manufacturer/vendor invoice to Ultra for approval. No Ultra Products shall be produced or manufactured without the express written approval of Ultra. Ultra shall, at all relevant times have the absolute right to inspect the manufacturing of Ultra Products and shall also have the right to seize, impound and destroy all counterfeit, unlicensed, authorized or defective merchandise.

b.      **Ultra Product Fees/Royalty.** Subject to the terms of Paragraph 12.c below, AMM shall pay to Ultra 40% of all gross revenue, net and free of all Taxes for all Ultra Product sold at Events by or through AMM, its agents or affiliates during the Term of this Agreement (the "Royalty"). All Royalties on the sales of Ultra Products shall be due and payable no later than 2 business days after the last scheduled day of the applicable Event, together with a complete beginning and ending inventory and accounting of all sales for all Ultra Product. Ultra shall approve all pricing of Ultra Product sold by or through Ultra.

c.      **Sale of Ultra Product; Quality; Counterfeit.** Ultra Product shall be sold only by AMM at the applicable Event in a separate tent or facility wherein no other merchandise of any brand shall be available, unless expressly permitted by Ultra.

15

11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002169

CROATIA 2012

d.  Counterfeit.  AMM shall use best efforts to police and prevent the production and sale of counterfeit merchandise of any kind at the applicable Event.

e.  Merchandise, Promotional Materials, Supplies.  Ultra shall furnish and deliver to AMM marketing materials such as CDs, DVDs, t-shirts, posters, fact sheets and any other marketing materials. Ultra shall supply a variety of promotional materials, if available, for the marketing kit, which will include television, radio and newspapers ads, posters, direct mail flyers, promotional premium items and other such materials needed to promote and advertise the applicable Event. Ultra shall endeavor to facilitate obtaining licenses and endorsements in order for AMM to use, publish, transmit, copy or reproduce any copyrighted Artist materials for the production and marketing of the applicable Event.

14.  UMF TV AFTER MOVIES

a.  Media Rights.  Ultra retains sole and exclusive rights to record, broadcast, stream over the internet, telecast, tape, videotape, film, photograph and make use of all internet (now existing or hereinafter created) of each Event, including the right to produce and distribute DVD and/or CD recordings.  AMM acknowledges that UMF Films and UMF TV shall be specifically and exclusively commissioned for all filming, videotaping and recording of the Event(s) and all other media needs contemplated by the parties herein.  Notwithstanding the foregoing, Ultra shall endeavor to grant the right to AMM to use the intellectual property works created hereunder on a limited, non-exclusive and royalty-free basis for promotional purposes only in accordance with the terms and conditions set forth in Exhibit "F."  With respect to the production of Event -after movies, -videos and the like ("UMF Videos"), UMF Films, UMF TV and their respective designees ("UMF TV") shall, prior to undertaking or producing any UMF Videos, present AMM with a production budget.  The production budget shall reasonably forecast the costs and expenses associated with the contemplated UMF Video project. AMM shall approve and remit payment to UMF TV respecting production budget upon the presentation of appropriate invoices.  AMM shall agree to pay UMF TV no less than 75% of the approved budget within 45 days of the Event and the 25% balance shall be due and payable 30 days following the Event.

b.  Clearances. AMM shall obtain and shall be solely responsible for any costs associated with any and all licenses relative to the broadcasting, streaming or recording of the Event, including releases and authorizations necessary to exploit the Work created and to protect the parties from infringement of any copyrights or trademarks of third parties including, without limitation, all necessary licenses from performing rights organizations including BMI, ASCAP and SESAC and their international counter-parts for the licensing of music, sound recordings, compositions, artist releases, model releases, clearance and licenses for all artwork, marketing and advertising content, record label releases and synchronization licenses.

c.  Live Streaming, Filming, Photography.  AMM shall arrange for and pay to UMF TV, in advance, all reasonable costs associated with the live streaming, filming and photography of the Event including costs associated with engaging the Ultra-approved film crew, equipment rental and other associated costs as designated fees.  In the occurrence of a conflict between the terms hereof and the Travel Rider, the Travel Rider shall control.

d.  UMF TV Host. AMM shall be responsible for covering any and all costs associated with engaging the services of the Ultra-approved Event host.

e.  Use of Proprietary Marks. AMM shall cause the Proprietary Marks to appear on all visual media used by AMM to promote each Event and the Proprietary Marks shall appear strictly as shown in Exhibit

16

11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002170

"A" to this Agreement, which design may be agreed upon at a later date. Ultra retains all approval rights on all trademarks, names, logos, marketing strategies and materials where its branding is utilized.

f.    Marketing Designs and Concepts. AMM shall submit proposed marketing designs and concepts created to Ultra for approval prior to AMM's use and publication. Ultra shall endeavor to grant approval or decline same within 3 business days after all proper releases and authorizations are obtained. To the extent that AMM develops or creates certain concepts, material or work (collectively the "Work") intended to be, or which is actually used for each Event, AMM expressly acknowledges that such Work contributed by AMM is being specially ordered and commissioned by Ultra for use in connection with the applicable Event, and as such, the Work contributed by AMM shall be considered a "work made for hire" as defined by the Copyright Laws of the United States. AMM hereby unconditionally and permanently assigns all intellectual property rights in the Work including, without limitation, all copyrights, trademarks, trade dress, trade secrets and patents which would otherwise be retained by AMM, or which fall outside of the "work-made-for-hire" doctrine under U.S. Copyright law. Ultra shall be the sole and exclusive owner and intellectual property proprietor of all rights and title in and to the results and proceeds of the Work in whatever stage of completion. If for any reason the results and proceeds of the Work are determined at any time not to be a "work made for hire," AMM hereby irrevocably transfers and assigns to Ultra all rights, title and interest therein, including all copyrights, trademarks, trade dress, trade secrets and patents, as well as all renewals and extensions thereto and the right to apply for registration of the copyrights, trademarks and patents for said Work with the U.S. Copyright Office, the United States Patent and Trademark Office and all appropriate Governmental Bodies inside and outside the United States.

15.    WEB PROPERTIES; DOMAIN NAMES

a.    Event Website. Ultra shall be responsible for all website design, artwork and English translation of textual content. AMM shall be responsible for any and all costs associated with maintaining and hosting the website, website design, artwork and English translation as provided by Ultra. Ownership of all content and Domain Names and websites used in connection with each Event, and any Domain Names and websites that incorporate any of the Proprietary Marks or any similar marks or names ("Domain Name(s)"), shall remain the property of Ultra. Within 15 days of execution of this Agreement, using best efforts, AMM shall take all steps necessary to transfer ownership of the registrations for any such Domain Names to Ultra or Ultra's designated affiliate or related company including, without limitation, the Domain Name [to be determined by Ultra]. All Domain Names should be registered by Ultra or its affiliated or related company, and AMM shall submit proposed Domain Names to Ultra for registration. Within 15 days of receipt of an invoice, Ultra shall reimburse AMM for all Domain Name registration and transfer costs incurred in compliance with this Agreement. Ultra shall reasonably cooperate with AMM and provide the information reasonably necessary for AMM to perform its website maintenance duties hereunder. Ultra retains the right to restrict, suspend or discontinue AMM's access to the website(s) and Domain Names, if necessary, as an additional means of enforcing the terms of this Paragraph 15.a and of any terms relating to AMM's maintenance of the website(s). AMM shall use best efforts to cause the timely upload of online content updates from the time submitted by Ultra to AMM, but in no event shall such upload exceed 3 business days.

b.    Ownership. AMM hereby unconditionally and permanently assigns to Ultra all intellectual property rights, from their inception, including Domain Names, and the foregoing shall be the sole property of Ultra in perpetuity, free from any claim whatsoever by AMM or any other person or entity. If for any reason the Domain Names are determined at any time not to be the sole property of Ultra,

17

11/02/12 EXECUTION

**CONFIDENTIAL**

CROATIA 2012

AMM hereby irrevocably transfers and assigns to Ultra all rights, title and interest therein.

c.  **Assignment.** The Domain Names shall be hereby the sole and exclusive property of Ultra. AMM hereby covenants and irrevocably assigns, transfers and conveys unto Ultra all rights, title and interest in and to the Domain Names.

d.  **Right to Alter.** Ultra shall have the sole, exclusive and absolute right to use, make, revise, modify, alter, amend, correct and update the Domain Names without attribution to AMM free of any duty, obligation or liability to AMM and free of all objections, claims, causes of action or demands by AMM who does hereby expressly, voluntarily, knowingly, absolutely and unconditionally waive and release AMM's successors, assigns, designees or nominees from the same.

e.  **Relinquishment of Rights.** AMM does hereby expressly and knowingly relinquish and waive any and all right(s) to claim authorship of and in the Domain Names or any portion thereof or any derivative work(s) based thereon.

f.  **Cooperation.** AMM shall execute and deliver to Ultra such instruments of transfer and other documents regarding the rights of Ultra in the Domain Names and other works and Ultra may request to carry out the purpose of this Agreement and to perfect Ultra's ownership interests. To that end, AMM hereby appoints Ultra as its attorney-in-fact for purposes of executing any and all documents reasonably necessary to perfect Ultra's ownership interests in the applicable portion of the Domain Names. AMM shall use best efforts to execute all documents and take all action as may be reasonably requested by Ultra to secure, perfect, enforce or otherwise protect Ultra's rights, title and interest in and to the Domain Names, including but not limited to all worldwide copyrights therein.

g.  **Weblink.** Ultra shall create a direct link on its website to AMM's web page, if any, for marketing of each Event. Unless otherwise agreed to in writing by the parties, Ultra is responsible for all website design and implementation. Ultra shall be responsible for launching a new website for the applicable Event after Ultra receives all website content from AMM. Ultra shall cause the upload of online content updates once AMM has submitted sufficient evidence that all appropriate and required consents, releases and licenses have been obtained by AMM.

### 16.  ULTRA TRAVEL

a.  **Travel Rider and Expenses.** AMM shall be solely responsible for the travel Expenses associated with the periodic travel of Ultra and Ultra's Affiliates to the Territory during the Term of this Agreement. Unless otherwise specified by Ultra, Ultra's standard travel rider, which is attached hereto as **Exhibit "E"** and which is made apart hereof, shall apply to subparagraph (b) and (c) below. Ultra shall change the travel rider from time to time or upon advance written notification to AMM. In the event of a conflict between the terms of this Agreement and the travel rider, the travel rider shall control (except for issues respecting (i) "travel days," which shall always apply and be included in and/or covered under, the terms of the Travel Rider regardless of whether such application and inclusion are expressly stated therein) and (ii) Ultra's unilateral right to periodically update the Travel Rider upon notification to AMM, including on a bi-annual basis in Ultra's sole and absolute discretion).

b.  **Due Diligence Trip(s).** Ultra, its representatives and designees, shall have the right but not the obligation to periodically travel to the Territory during the Term of this Agreement to conduct general due diligence, to meet in-person with AMM and its personnel, to visit venues, to meet with potential sponsors and other local marketing partners and to primarily attend to other Event-related business

18                                          11/02/12 EXECUTION

**CONFIDENTIAL**                          WEG 002172

CROATIA 2012

("**Due Diligence Trip(s)**"). AMM shall be responsible for all Expenses associated with the Due Diligence Trip(s). If Ultra elects to make a Due Diligence Trip to the Territory, the Due Diligence Trip shall be limited to a duration of not more than 7 days and the terms of the Travel Rider shall apply.

c.      **Production Trip(s)**.  Ultra, its representatives and designees shall have the right but not the obligation to travel to the Territory to oversee and manage the production of, and to attend, each Event (the "**Production Trip(s)**"). AMM shall be solely responsible for all Expenses associated with the Production Trip(s), which shall be limited to a duration of not more than 7 days and the terms of the Travel Rider shall apply.

d.      **Travel Deposit**.  Ultra shall have the right, at its sole option and discretion, to require AMM to remit a refundable deposit of $50,000 with Ultra or its designee to cover the Expenses in this Section and all Travel Rider expenses within 7 days of Ultra's request. At the conclusion of any applicable Event, any unused portion of the foregoing travel deposit shall either be refunded or credited to AMM at the option of Ultra. All amounts, fees, deposits and compensation due to Ultra hereunder shall be exclusive of Taxes.

e.      **Announcements**.  AMM shall not be allowed to make any public announcement of any Event unless and until Ultra's travel has been confirmed.

f.      **Travel Visas**.  AMM shall arrange and pay for all reasonable costs (including all filing, application, agency or expedite fees) associated with obtaining travel visas for Ultra's traveling personnel in a timely manner such that Ultra's traveling personnel can obtain their issued visas no later than 30 days prior to the next upcoming Event or trip for purposes of coordination of such Event.

17.      ADDITIONAL BUSINESS VENTURES

a.      **Proposed Transaction; Ultra Resort**.  The parties are involved in confidential business discussions regarding a potential commercial transaction whereby the parties desire to develop, manage and undertake potential Events or related activities in Hvar Island, including or relating to the development of (i) an "Ultra Resort" and/or (ii) music boat/ship cruise or similar undertakings (the "**Proposed Transactions**").

b.      **Exclusivity of Transaction**.  AMM, by and on behalf of its subsidiaries, affiliates, agents, principals, members, stockholder and employees, agrees that it shall not solicit, initiate, engage in, participate in or in any manner encourage discussions or negotiations with any person or entity (other than Ultra and its representatives) relating to the Proposed Transactions. AMM shall also immediately cease any such activities that may be taking place currently relative to the Proposed Transaction.

c.      **Ultra's Right of First Refusal; Right of First Offer**.  Ultra shall, during the Term of this Agreement, have a right of first refusal and a right of first offer respecting any aspect of the Proposed Transactions.

18.      INDEMNIFICATION

a.      **General Indemnification**.  AMM shall hold harmless, defend and indemnify Ultra, its affiliates, subsidiaries, officers, directors, agents, subcontractors and employees from any and all legal and financial liability or claims relating to property damage or personal injuries, including death, and other claims arising from (i) any breach of any of the terms, conditions, promises or covenants hereunder; (ii)

18                                                      11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002173

CROATIA 2012

any negligent act or omission; (iii) any failure to collect, remit and file any applicable Taxes to Governmental Bodies; (iii) any trademark or copyright infringement; or (iv) any other claims whatsoever, including unfair competition, deceptive or unfair business practices, false advertising, and other tort claims by AMM, its agents, subcontractors, third parties or employees.  With respect to the foregoing Indemnification, Ultra shall have its choice of counsel for a defense and shall have complete control over the non-monetary aspects of any settlement of such claims.

b.    **Indemnification; Tax Claims.**  AMM shall hold harmless, defend and indemnify Ultra, its affiliates, subsidiaries, officers, directors, principals, agents, authorized agents and employees from any and all legal and financial liability or claims relating to any failure (whether by AMM or Ultra) to collect, remit and file any Taxes with Governmental Bodies.  The foregoing indemnification obligation shall indefinitely survive the termination of this Agreement.

c.    **Indemnification; Infringement Claims.**  AMM shall hold Ultra and its affiliates harmless as well as defend and indemnify Ultra, its officers, directors, subsidiaries and affiliates from any claim(s) of any kind by any third parties directly or indirectly related or attendant to AMM's performance under this Agreement and to any aspect of each Event including, without limitation, claims for copyright or trademark infringement or relating to the creation or exploitation of the Works or from any claims arising from the Radio Program.

19.    LIMITATION OF LIABILITY AND DAMAGES

a.    **Limitation of Liability.**  IN NO OCCURRENCE SHALL ULTRA BE LIABLE FOR ANY DAMAGES IN EXCESS OF $10,000, NOR SHALL ULTRA BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND OR NATURE WHATSOEVER, WHETHER ARISING UNDER CONTRACT OR TORT OR ANY OTHER THEORY OF LIABILITY, EVEN IF THE POSSIBILITY OF SUCH DAMAGES WERE DISCLOSED TO A PARTY OR COULD HAVE BEEN REASONABLY FORESEEN.  IN THE OCCURRENCE OF A BREACH OF THIS AGREEMENT, ULTRA SHALL NOT BE LIABLE FOR ANY SPECIAL, CONSEQUENTIAL OR LOST PROFITS DAMAGES.

b.    **Liquidated Damages.**  With regard to any entitlement of liquidated damages in this Agreement by Ultra, AMM acknowledges and agrees that Ultra shall be entitled to any such rights and damages on grounds that the harm to Ultra arising from AMM's breach shall be difficult to estimate; therefore, the parties agree in advance that the liquidated damages specified shall be reasonable compensation and are not in any way disproportionate to the actual or anticipated damage to Ultra.  AMM further agrees not to bring an action or to raise any defenses on grounds that this provision is void, that Ultra's recovery shall be limited only to actual damages or that this provision is otherwise unenforceable.  AMM further acknowledges and agrees that all remedies provided for herein shall be cumulative, and the assertion of a particular remedy by Ultra shall not preclude Ultra's right to exercise any other rights or preclude Ultra from seeking any other remedies.  This liquidated damages provision shall not be interpreted to limit Ultra's right to collect Additional Promotional Fees hereunder or to exercise any audit rights/any other remedies available under applicable laws.

20.    TERMINATION; REMEDIES

a.    **Material Breaches.**  The parties agree that the following partial list, shall constitute a material breach hereunder: (a) failure by AMM to select an Event date within a time period agreed to by the parties; (b) failure of the parties to agree to an Artist Fee as a result of some delay or other nonperformance by AMM; (c) failure of AMM to produce one Event per year during the Term; (d)

20                                              11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002174

CROATIA 2012

cancellation, in whole or in part, of an Event unrelated to a force majeure occurrence; (e) failure by AMM to achieve ticket sale projections; (f) failure to pay crew invoices as required herein; or (g) any other failure of performance hereunder by AMM.

b.      **AMM Remedies.**  In the event of a material breach by Ultra, AMM shall notify Ultra of such breach in writing and Ultra shall have 60 days, or any other reasonable time determined by Ultra, in which to cure such breach.  In the occurrence that Ultra fails to cure an alleged breach, AMM shall avail itself of any and all legal, but not equitable, remedies.  AMM acknowledges and agrees that any remedies entitled to it hereunder shall be remedies at law, not equity.

c.      **Ultra Remedies.**  In the occurrence of a breach by AMM, Ultra shall notify AMM of such breach and AMM shall have 5 calendar days to cure such breach.  If AMM fails to cure the breach hereunder, Ultra shall have the right, without further notice or demand, to avail itself of any and all legal and equitable remedies including, (a) to immediately terminate this Agreement and/or (b) to retain any and all monies remitted to Ultra or any of its subsidiaries or affiliates for any reason, including but not limited to Promotional Fees as liquidated damages (and not as a penalty).

d.      **Cross-Default.** Any default by AMM, either hereunder or under any other agreement between and/or among AMM and Ultra, or their respective subsidiaries, affiliates or principals, shall, without further notice or demand, also constitute a default and material breach by AMM hereunder.

e.      **Retake Rights.** In the event of a breach hereunder by AMM, AMM hereby automatically assigns all of its rights, title and interest hereunder and under any other agreements, contracts or arrangements respecting the Event(s) to Ultra or Ultra's designee. Ultra may, at its sole and absolute discretion, either (i) assume all benefits hereunder or (ii) reassign to another designee who shall assume all Ultra's rights. AMM hereby irrevocably appoints Ultra as its attorney-in-fact for any purpose, including executing any and all documents reasonably necessary to protect Ultra's interests hereunder.  Notwithstanding the foregoing, the parties hereby acknowledge and agree that Ultra shall have no duties or obligations under any other agreements, contracts or arrangements respecting the Event(s) unless such duties and/or obligations are expressly assumed by Ultra, nor shall Ultra be deemed to be an agent of AMM unless or until Ultra expressly assumes such a relationship.

f.      **Cumulative Remedies.** The remedies provided for herein shall be cumulative, and the assertion of a particular remedy by Ultra shall not preclude AMM of any other rights or from the seeking of any other remedies.

g.      **Termination Option and Fee.** Notwithstanding any provision contained herein to the contrary, AMM shall, during the Term of this Agreement, have a right to terminate this Agreement upon (i) written notification to Ultra of AMM's intention to terminate the Agreement and (ii) upon payment to Ultra of the next upcoming Promotional Fee as liquidated damages (the "**Termination Fee**").  For the avoidance of doubt and for purposes of illustration only, if, following the conclusion of Year 3, AMM elects to terminate the Agreement, AMM shall remit to Ultra, as liquidated damages, the amount of $292,969 as a Termination Fee.  AMM acknowledges that any Termination Fees paid hereunder shall be paid as liquidated damages and not as a penalty.

21.      GOVERNING LAW

a.      **Governing Law; Venue; Forum Non-Conveniens.**  This Agreement shall be construed and governed under the laws of the United States, specifically, the State of Florida, notwithstanding conflicts

21                                          11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002175

CROATIA 2012

of law principles or the doctrine of forum non-conveniens. Any legal action arising from this Agreement shall be brought in Miami-Dade County, Florida and AMM hereby consents to the exclusive jurisdiction thereof and agrees not to raise any affirmative or other legal defenses based on lack of personal jurisdiction, inconvenient forum or any conflict of law or similar principle. In the event that a court of competent jurisdiction determines that bond is a necessary prerequisite to the issuance or enforcement of any injunction sought by Ultra, AMM agrees that a bond not exceeding $1,000 shall be sufficient. The prevailing party in any action for either damages or injunctive relief shall be entitled to an award of attorneys' fees and costs incurred at all pre-litigation, post-litigation, trial and appellate phases.

b.    Personal Jurisdiction. AMM hereby submits to the jurisdiction set forth above and designates the following individual and/or entity as AMM's duly authorized agent to accept service of process on its behalf, and which entity and/or individual maintains a principal place of business or residence in the State of Florida:

AMM represents and warrants that said designee has accepted said authorization, and AMM agrees that service upon its designated Agent, shall be deemed service upon AMM.

### 22.    NON-COMPETITION

a.    Non-Competition. Without limiting any provision of this Agreement, and except to the extent set forth in 22d Paragraph, below, AMM specifically and additionally agrees that during the Term of this Agreement, and for a period of 3 years after its expiration or termination by any party and for any reason, it shall not, without Ultra's prior approval (and which approval may be withheld, delayed, or conditioned), directly or indirectly sponsor, promote, produce, host, co-sponsor, co-promote, co-produce or co-host any electronic music events affiliated with the following brands or promoters, which list may be supplemented from time to time by Ultra in its sole and absolute discretion:

Godskitchen and/or Global Gathering (Excluding Fusion    Insomniac and/or Electric Daisy
                                                          Carnival
ID&T and/or Sensation and/or TomorrowLand                 UDC and/or Dance
                                                          Valley
    Creamfields                                           Gatecrasher
    Angel Music                                           Wonderland
    Made Event                                            WeLove
Exit Festival (or its organizers)                         Sziget Festival (or its organizers)
Hideout                                                   Bataion Sound Festival
Festival

Except as otherwise specified herein, AMM further agrees, without Ultra's prior approval, which approval may be withheld, delayed or conditioned, not to directly or indirectly create any new electronic music club shows, trade names, trademarks, logos, corporate identity(ies) or events to be used, promoted or held in the Territory during the Term of this Agreement, except as specified herein.

22                                    11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002176

CROATIA 2012

b.   Discontinuation of Current Festivals. AMM shall, as of the Effective Date, discontinue, whether directly or indirectly, the production, promotion or sponsorship of the RIVAL DISCOTHEQUE festival and the BIG BEACH festival.

c.   Rebranding of Umagination Festival. AMM shall, as of the Effective Date, discontinue production of the UMAGINATION FESTIVAL, and shall rebrand same as either a ROAD TO ULTRA branded Event or another similarly branded Event as determined by Ultra.

d.   Exceptions.   Ultra acknowledges and agrees that, notwithstanding the provisions of Paragraph 22a, the provision of food and beverage services by AsliPro Ltd., to ZAGREB ARENA relative to the SENSATION and HIDEOUT music festivals, shall not constitute a breach of this Section 22.

e.   Acknowledgements. AMM acknowledges and agrees that the covenants and all restrictions, guidelines and rules described in this Section 22 are reasonably limited in time, scope and geography and are reasonably necessary to protect legitimate business interests of Ultra including maintenance of, control over and protection of the goodwill associated with the Proprietary Marks and Ultra's other intellectual property, brands, corporate image and business reputation.

### 23.   CONFIDENTIALITY, NON-DISCLOSURE AND NON-DISPARAGEMENT

a.   Confidentiality/Non-Disclosure.   During the Term of this Agreement, AMM shall acquire knowledge of confidential information including Ultra's trade secrets, strategies, promotional techniques, Artist, vendor or sponsor contact information, terms of agreements with Artists, vendors or sponsors, passwords and future plans. AMM agrees not to disclose such confidential information during the Term of this Agreement, and specified time thereafter, in accordance with the terms of the Non-Disclosure Agreement executed by AMM and which is attached hereto as Exhibit "C" and which is otherwise incorporated herein by reference.

b.   Non-Disparagement. AMM shall not, during the Term of this Agreement, and for a period of 5 years following the termination or expiration hereof, directly or indirectly (or in any capacity or manner) make, express, transmit, speak, write, verbalize or otherwise communicate in any way or cause, assist, encourage or participate in any of the foregoing, any remark, comment, message, information, declaration or communication or other statement of any kind, whether verbal, in writing, electronically transferred or otherwise that might be reasonably construed to be derogatory, negative or critical of Ultra, its affiliates, subsidiaries, officers, directors, employees, agents, subcontractors or representatives. AMM acknowledges that Ultra's brand is of the highest quality and respect in the industry and agrees to uphold, using best efforts, that image and quality when performing its obligations under this Agreement.

### 24.   FORCE MAJEURE

a.   Force Majeure Occurrence. Upon the occurrence of a Force Majeure Event, provisions of this Paragraph apply only to an affected Event in the occurrence by governmental actions, an act of God, war conditions, civil tumult, terrorism, governmental travel restrictions, recommendations or warnings, epidemic, transportation strike or interruption, state or national emergency, fire or other circumstance not under the control of either party ("Force Majeure"). In the instance of a Force Majeure occurrence, any advance deposits on ticket sales royalties paid to Ultra by AMM relative to the applicable Event, shall be returned (on a pro-rata share thereof, as the case may be, if the applicable Event consists of multiple dates) to AMM upon cancellation of such Event, provided only that AMM is refunding ticket

23

11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002177

CROATIA 2012

sales to purchasers instead of honoring the ticket at a rescheduled future Event(s). In no occurrence shall the Promotional Fee be refunded. Rather, Ultra shall reserve the right to apply such Promotional Fee to a future Event.

b.      **Cancellation; Non-Force Majeure Events.**   In the event of an Event postponement or cancellation, the terms of Paragraph 11.o (Refund Program) shall apply.

### 25.   MISCELLANEOUS

a.      **Amendment.**   This Agreement shall not be amended or modified in any way, except by a written instrument duly executed by the parties.

b.      **English; Foreign Language Translation.**   This Agreement shall be executed in English.   If, however, this Agreement is required to be translated into a language other than English pursuant to applicable laws of the Territory, the English version shall control in the occurrence of a conflict between the English and non-English versions and AMM shall be solely responsible for the translation costs and Expenses.

c.      **Integration.**   This Agreement sets forth the entire Agreement regarding the Event(s) and respecting the substance of this Agreement and supersedes all prior negotiations, understanding and agreements.

d.      **Counterparts.** This Agreement may be executed in counterparts, including via electronic and digital signature and shall be delivered in-person, via fax or e-mail and each such executed facsimile or scanned copies shall be valid and fully enforceable and shall be treated with the same legal affect as a fully executed original.

e.      **Exhibit; Schedules.** This Agreement, together with all attachments, including schedules, exhibits and riders, constitutes the entire Agreement between the parties with respect to the subject matter hereof.

f.      **Assignment; Delegation.** AMM shall not assign any of its rights, title or interest herein nor shall AMM delegate its obligations under this Agreement in whole or in part, without the express written consent of Ultra and such consent may be withheld, delayed or conditioned at the sole discretion of Ultra. Any stock or asset sale, transfer or pledge that exceeds 20% of AMM's total issued shares shall constitute an assignment hereunder. Any attempts by AMM to assign rights or delegate duties hereunder in contravention of the terms of this provision shall be void.

g.      **Binding Effect.** This Agreement shall bind and inure to the benefit of the successors and assigns of AMM.

h.      **Notices.** All notices required hereunder shall be provided by certified mail, overnight courier or other means which provides for evidence of receipt, to the parties at their respective addresses set forth above, with an additional copy to each intended recipient to be sent by e-mail, with a copy of any notice to Ultra to be sent to:

11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002178

CROATIA 2012

Attn: General Counsel
WORLDWIDE EVENT ENTERTAINMENT GROUP, INC.
1000 NW 14th Street
Miami, FL 33136

i.    **Applicable Laws; Assurances**.   AMM, its officers, directors, agents, employees and representatives shall at all times comply with all applicable laws, rules and regulations when performing its obligations hereunder. Each party agrees to execute, deliver and file any document or instrument necessary or advisable to realize the purposes of this Agreement.

j.    **Books; Records**.  AMM shall maintain complete and accurate records of the Events including the number of attendees, tickets sold, revenue received, tickets not sold, passes honored, Taxes collected with respect to such sales, bank statements, deposit records, ledgers, travel expenses, tax returns and receipts which shall be in the form designated by Ultra for a period of 2 years following the applicable Event. AMM shall furnish to Ultra a copy of the records and/or reports upon Ultra's request.

k.    **Audit Rights**. Ultra shall have the right upon 10 days notice to AMM, to audit, review, examine and reproduce the books and records relating to the Events. If any such audit, review or examination reveals that gross revenue, sponsorship fees, gross ticket sales, Ultra Product fees, or any other fees, Royalties or commission owed to Ultra pursuant to the terms of this Agreement have been understated in any report to Ultra, AMM shall (i) immediately pay to Ultra threefold the amounts herein upon demand, in addition to interest from the date such amount was first due until paid, at the rate of 1.5% per month; and (ii) reimburse Ultra for any and all costs and expenses connected with such audit, review or examination (including, without limitation, reasonable accounting and attorneys' fees).

l.    **Waiver**. Failure by Ultra to enforce any of the provisions of this Agreement or any rights with respect hereto, or to exercise any election provided for herein, shall in no way be considered a waiver of such provisions, rights, or elections, or in any way affect the validity of the applicable provision or Agreement nor shall such failure to enforce prejudice Ultra from later enforcing or exercising the same or any other provisions, rights or elections under this Agreement.

m.    **Status**.  The relationship between the parties shall not be subject to regulation by any Governmental Body or Governmental Authority.

n.    **Independent Contractor**. AMM shall be an independent contractor of Ultra, and as such, shall have no authority to bind or commit Ultra, any Ultra Affiliate or any principal of Ultra.  AMM acknowledges and agrees that nothing herein shall be deemed or construed to create a joint venture, partnership, agency, franchise or employer/employee relationship for any purpose.

o.    **Consent**. Any consents, authorizations or approvals required by Ultra hereunder may be withheld, delayed or conditioned in the absolute discretion of Ultra. If Ultra fails to provide its written consent, authorizations or approval within a timeframe specified herein, such consent shall be deemed denied.

p.    **Paragraph Headlines**. The captions and paragraph headlines in this Agreement are solely for convenience and reference. They do not define, describe, extend or limit the scope or intent of this Agreement or any of its provisions.

q.    **Survival**. Paragraphs 8.f (Taxes; Banking), 11.e (Audit), 11.m (Third-Party Beneficiaries), 11.o

25

11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002179

CROATIA 2012

(Refunding), 13.b (Ultra Product Fees/Royalty), 14.a (Media Rights), 15 (Domain Names), Section 17 (Indemnification), Section 19 (Limitation of Liability and Damages), Paragraph 20.a (Material Breaches), Paragraph 20.b (AMM Remedies), Paragraph 20.e (Retake Rights), Paragraph 20.f (Cumulative Remedies), Section 21 (Governing Law), Section 22 (Non-Competition), Section 23 (Confidentiality, Non-Disclosure and Non-Disparagement), Section 24 (Force Majeure) and Section 25 (Miscellaneous) shall indefinitely survive the early termination or expiration of this Agreement unless otherwise specified herein.

r.     **Severability.** If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal, or otherwise unenforceable, the unenforceable provision shall not affect the otherwise valid terms or provisions or the whole of this Agreement. The applicable terms or provisions shall be deemed modified to the extent necessary to render such provision enforceable, and the rights and obligations of the parties will be construed and enforced accordingly, preserving to the fullest permissible extent the intent and agreements of the parties set forth herein.

s.     **Personal Guarantee.** AMM shall cause its principals, members and directors, namely, MPG SOUTHEAST EUROPE, LTD., ASIIPRO, LTD., and COLLEGIUM MONDIAL TRAVEL LTD., to guarantee in a separate written instrument, the performance of AMM, its successors and assigns respecting the full, prompt and complete performance of AMM and all of its obligations under this Agreement, including all monetary obligations, whether arising before or after termination of this Agreement in a form acceptable to Ultra and which guarantee shall not be discharged or otherwise affected by any waiver, indulgence, compromise, settlement, extension of credit or variation of any of the terms of this Agreement.

[SIGNATURES TO FOLLOW ON NEXT FOLLOWING PAGE]

26

11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002180

CROATIA 2012

IN WITNESS WHEREOF, the parties execute this Agreement intending to be bound thereby.

AMM:                                              ULTRA:

ADRIA MM PRODUCTIONS LTD                          WORLDWIDE ENTERTAINMENT GROUP, INC.

By:                                               By:

Print Name:   Josip Z. Basic                      Print Name:   Russell C. Faibisch

Title:        Director                            Title:        President

Witness:                                          Witness:

Print Name:                                       Print Name:

Address:                                          Address:

Witness:                                          Witness:

Print Name:                                       Print Name:

Address:                                          Address:

AMM:

ADRIA MM PRODUCTIONS LTD

By:

Print Name:   Nikola Busljeta

Title:

Witness:

Print Name:

Address:

Witness:

Print Name:

Address:

27

11/02/12 EXECUTION

**CONFIDENTIAL**

WEG 002181

**Exhibit A**

**PROPRIETARY MARKS**





**CONFIDENTIAL**

WEG 002182

**Exhibit B**

**TICKETING REPORT**

**CONFIDENTIAL**

WEG 002183

**Exhibit C**

NON-DISCLOSURE AND CONFIDENTIALITY AGREEMENT (NDA)

CONFIDENTIALITY, NONSOLICITATION AND NONDISCLOSURE AGREEMENT

This **CONFIDENTIALITY, NONSOLICITATION AND NONDISCLOSURE AGREEMENT** ("Agreement") is made effective as of the date set forth below by and among **UMF PRODUCTIONS, Inc.**, on behalf of itself, its subsidiaries, affiliates, successors and assigns now existing or hereinafter created (hereinafter collectively "Company") and **Vasja Veber**, an individual on behalf of **FM Musick d.o.o.** having a principal place of business located at Poduliska cesta 82 1000 Ljubljana, Slovenia, (hereinafter "Contractor"). The parties agree as follows:

1.      CONSIDERATION. Contractor agrees to the terms and conditions set forth in this Agreement as a condition of and in consideration of their continued business relationship and the receipt of the compensation now and hereafter paid or exchanged to Contractor by Company.

2.      TRADE SECRETS AND CONFIDENTIAL INFORMATION. Contractor acknowledges and agrees that Company is engaged in the highly competitive music festival business, namely the production and promotion of outdoor music festivals and related events, including in the State of Florida and certain international markets. Company's involvement in the music festival business has required and continues to require the expenditure of substantial amounts of time, money and resources and the use of skill, knowledge, and expertise developed over an extended period of time. As a result, Company has developed and will continue to develop certain valuable Trade Secrets and Confidential Information that are unique and valuable to, and the essence of, Company's business, and the disclosure of which to others by Contractor would cause Company great and irreparable harm. Such Trade Secrets and Confidential Information have and will continue to be disclosed by Company to Contractor during their business relationship.

(a)     "**Confidential Information**" means Company's data, materials, information and documentation (whether in tangible or intangible form, including Confidential Information memorialized by Contractor), which is valuable to Company and not generally known to the public or its competitors, including: (1) financial information, such as earnings, profitability, assets, debts, prices, fee structures, expenses, budgets (historical and projected), volumes of purchases or sales (historical and projected), or other financial data, whether relating to Company generally, or to particular products, services, geographic areas, or time periods; (2) production, promotion, license, supply, vendor, and service information, such as information concerning the goods and services utilized or purchased by Company, the names and addresses of Company's producers, promoters, licensees or sub-licensees, suppliers and vendors, the terms of contracts with such promoters, producers, licensees, sub-licensees, suppliers or vendors, or of particular transactions, or related information about prospective promoters, producers, licensees, suppliers and vendors that yield advantages to Company if the details of such relationships or associations are not generally known; (3) marketing and advertising information, including details about ongoing or proposed branding, marketing or advertising programs, strategies, or agreements by or on behalf of Company, marketing forecasts, results of marketing efforts or information about impending music festivals, merchandising, projects or other related transactions; (4) customers, service providers, licensees, clients, joint venture or marketing partners or entities with whom Company has a strategic alliance (hereinafter collectively "Customer") information, including sales, service information, pricing, royalty or commission models and information for Customers, as well as, any compilations of existing Customers, Customer proposals or agreements between Customers and Company; (5) business plans and strategies, business models, brand development, licensing arrangements, sales forecasts and strategies, and similar business information; (6) non-public information regarding pending or threatened litigation, claims or disputes and Company's litigation strategies respecting same, and (7) artist or

**CONFIDENTIAL**

WEG 002184

perspective artist information to the extent that such information is not generally known to the public. Confidential Information shall also mean any information, documentation or material deemed to be Confidential Information by Company.

(b)    "Trade Secrets" means Confidential Information that meets the requirements of applicable trade secret law, including any information, such as formulas, patterns, compilations, programs, devices, methods, techniques or processes that derive economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and all other information that Company undertakes to keep secret or determines to be a trade secret.

3.    NONDISCLOSURE OF TRADE SECRETS AND CONFIDENTIAL INFORMATION. Contractor acknowledges that during their business relationship with Company, Company has and will continue to make available to Contractor certain Confidential Information and Trade Secrets to enable Contractor to adequately perform their duties. During the business relationship, Contractor agrees to use such Confidential Information and Trade Secrets solely for Company's benefit, and Contractor shall not disclose, furnish, transmit, send, or disseminate Confidential Information and Trade Secrets to any person or entity other than those within Company's organization (on a need to know basis) or as expressly authorized by Company. Contactor agrees that he will not, so long as the pertinent information or documentation remain Trade Secrets, directly or indirectly use, disclose, furnish, transmit, send or disseminate to any other person, organization or entity, or otherwise employ, any Trade Secrets in contravention of this Agreement. Contractor further agrees that he will not, during the business relationship with Company and for a period in perpetuity after the termination of such business relationship (whether voluntarily or involuntarily, with or without cause, or with or without prior notice), otherwise directly or indirectly use, disclose, furnish, transmit, send, or disseminate to any other person, organization or entity, or otherwise employ, any Confidential Information. Contractor acknowledges that Company has received and in the future will receive from third parties certain confidential or proprietary information and trade secrets subject to a duty on Company's part to maintain the confidentiality of such information and to use it only for specified limited purposes. Contractor agrees to hold all such confidential or proprietary information and trade secrets in the strictest confidence and not to disclose it or use it except as necessary for the performance of their duties consistent with Company's agreement with such third party. Contractor agrees that he will not, during the business relationship with Company, improperly use or disclose any confidential information or trade secrets of any other party, including a former employer.

4.    RETURN OF PROPERTY. Contractor agrees that upon the termination of the business relationship with Company (whether voluntarily or involuntarily, with or without cause, or with or without prior notice), Contractor will return to Company: (a) all equipment, products, laptops, cellular or mobile telephones/PDAs, credit or charge cards, and all other property belonging to Company; (b) all documents and other materials, whether in electronic, hardcopy or physical form, and whether made or compiled by Contractor alone or with others or made available to Contractor while performing services for Company pertaining to Trade Secrets, Confidential Information, or other inventions and works of Company; and (c) all Trade Secrets, Confidential Information, other inventions, or any other property of Company in Contractor's possession, custody, or control.

5.    CUSTOMER NONSOLICITATION. Contractor acknowledges that in the course of their business relationship with Company, Contractor has developed business relationships and goodwill with Company's Customers and prospective customers on behalf of Company. Contractor further

**CONFIDENTIAL**

WEG 002185

acknowledges the unique value of the business relationships and goodwill that Contractor has developed on Company's behalf. Contractor therefore agrees that during their relationship with Company, Contractor will not (on Contractor's behalf or on behalf of any person or entity other than Company), solicit the business (of the same or similar type that they solicited on behalf of Company) of any Customer, including actively sought prospective customers, with whom Contractor had material contact on behalf of Company during the last two (2) years prior to the termination of the parties' relationship. "Material contact" means for the purpose of this Agreement, Customers and prospective customers with whom Contractor dealt, whose dealings were coordinated or supervised by Contractor, or about whom Contractor obtained Trade Secrets or Confidential Information. Contractor acknowledges that the time limits and restrictions set forth in this Paragraph 5 are reasonable, and that the enforcement of these provisions would not create an undue burden on Contractor.

6. **NONSOLICITATION.** Contractor agrees that during their business relationship with Company they will not, on their behalf or on behalf of any other person or entity, solicit, divert, or hire away, or attempt to solicit, divert, or hire away, any person employed by Company with whom Contractor had material contact during Contractor's business relationship with Company. Contractor acknowledges that the time limits set forth in this Paragraph 6 are reasonable, and that the enforcement of this provision would not create an undue burden on Contractor.

7. **SEVERABILITY.** Contractor acknowledges and agrees that the covenants set forth in this Agreement are necessary and fair for the protection of Company's Confidential Information and Trade Secrets, business relationships, and goodwill. If any provision, restriction, or paragraph in this Agreement is determined to be in violation of any law, rule, or regulation or otherwise unenforceable, such determination shall not affect the validity of any other provision, restriction, or paragraph of this Agreement, but such other provisions, restrictions, or paragraphs shall remain in full force and effect. Each provision, restriction, or paragraph of this Agreement is severable from every other provision, restriction, or paragraph and constitutes a separate and distinct covenant. If a court should decline to enforce any covenant in this Agreement, each party agrees to modification of the terms hereof by the court to the extent necessary to make such covenant reasonable and otherwise enforceable.

8. **INJUNCTIVE AND OTHER RELIEF.** Contractor understands, acknowledges, and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, Company shall suffer irreparable injury for which there is no adequate remedy at law, and Company will therefore be entitled to injunctive relief from any court of competent jurisdiction enjoining said breach or threatened breach. Contractor further acknowledges that Company also shall have the right to seek a remedy at law, as well as, or in lieu thereof, equitable relief including specific performance, preliminary and permanent injunctive relief, without bond, to enforce any term of this Agreement. In the event that a court of competent jurisdiction determines that bond is a necessary prerequisite to the issuance or enforcement of any injunction sought by Company, Contractor agrees that a bond not exceeding $1,000 shall be a sufficient. The prevailing party in any action for either damages or injunctive relief shall be entitled to an award of attorneys' fees and costs incurred at all pre-litigation, post-litigation, trial and appellate phases.

9. **WAIVER OF BREACH.** Company's waiver of a breach of any provision of this Agreement by Contractor does not waive any subsequent breach by Contractor, nor does Contractor's failure to take action against any other independent contractors of employee for similar breaches operate as a waiver by Company of a breach.



**CONFIDENTIAL**

WEG 002186

10. **ENTIRE AGREEMENT AND MODIFICATION.** This Agreement supersedes any and all prior understandings and agreements between the parties concerning the subject matter of this Agreement. This Agreement may not be altered or amended except in writing, signed by Contractor and an authorized officer of Company. Any subsequent change or changes in Contractor's duties, salary, or other compensation will not affect the validity or scope of this Agreement.

11. **OPPORTUNITY TO REVIEW.** Contractor acknowledges that Contractor has had sufficient opportunity to review this Agreement, has consulted with an attorney if so desired, and understands the terms and conditions of this Agreement. Contractor further acknowledges that Contractor's execution of this Agreement is voluntary.

12. **CHOICE OF LAW AND CHOICE OF FORUM.** Contractor agrees that he conducts business involving Company in Florida and that his work is based in Florida. Therefore, the parties agree that this Agreement is to be governed by and construed under the laws of the State of Florida without regard to conflict of laws principles. The obligations set forth in this Agreement are in addition to the obligations imposed by the Uniform Trade Secrets Act and any other applicable federal or state statutes. The parties further agree that any claim or controversy arising out of this Agreement, related to this Agreement, or seeking to construe or interpret this Agreement, shall be filed exclusively and only in either the U.S. District Court for the Southern District of Florida or the Eleventh Judicial Circuit in and for Miami-Dade County, Miami, Florida. Contractor hereby consents to personal jurisdiction and venue in either of those courts.

13. **SUCCESSORS AND ASSIGNS.** This Agreement shall be binding upon and inure to the benefit of: (a) Company and its affiliates, and its and their successors and assigns, including but not limited to any company into which Company or its affiliates may be merged or by which it or they or all or any substantial portion of its or their assets or business may be acquired; and (b) Contractor and their heirs, legal representatives, executors, agents, beneficiaries, administrators, successors, and assigns. Such affiliates, successors, and assigns are expressly authorized to enforce the terms of this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Agreement and intend it to be effective upon execution by both parties.

CONTRACTOR

By: _____
    Vasja Veber

FM Musick d.o.o.

By: _____
    Vasja Veber, Authorized Agent

Date: June 27, 2012

**CONFIDENTIAL**

WEG 002187

**Exhibit D**

**TECHNICAL RIDER**

MAIN STAGE:

PA

| | |
|---|---|
| 16 | d&b D12 amp racks 4 units |
| 20 | d&b J8 3 way line array loudspeaker |
| 4 | d&b J series flying fram with case |
| 8 | d&b Q1 full range line array loudspeaker near fill |
| 2 | d&b D12 amp rack 2 units near fill |
| 12 | d&b J12 3 way line array loudspeaker |
| 24 | d&b J-SUB 3x18 Cardiod Subwoofer Flown left/right |
| 24 | J INFRA 3X21 Cardioid Subwoofer |

FOH

| | |
|---|---|
| 1 | Venue Profile console |
| 1 | Midas Heritage 3000 52 channel console |
| 1 | Lake system drive rack |
| 1 | Midas eay tilt |
| 1 | Tascam CD professional CD player |
| 1 | A processing rack/FX's 16 comps, 12 gates, 5 fx |
| 1 | Midas console PSU rack |
| 1 | Whirlwind 48 input 8 return splitter snake |

MONITORS

| | |
|---|---|
| 1 | Venue Profile console |
| 1 | Midas Heritage 3000 |
| 1 | Tascam professional cd player |
| 14 | d&b M2 monitor speaker |
| 2 | d&b Audiotechnick B2 subwoofer 2x18 |
| 4 | d&b D12 amp rack 4 units |
| 4 | d&b D6 digital power amp |

SIDEFILL

| | |
|---|---|
| 8 | d&b Q1 Full range line array loudspeaker |
| 8 | d&b C7 sub |
| 2 | d&b Audiotechnick B2 subwoofer 2x18 |

DRUMFILL

| | |
|---|---|
| 4 | d&b Q-Sub 18" subwoofer |
| 2 | d&b MAX 15 Full Range loudspeaker |

**CONFIDENTIAL**

WEG 002188

| MAIN STAGE | |
|---|---|
| | |
| Type | Quantity |
| ALPHA BEAM 1500 | 38 |
| ALPHA SPOT HPE 1500 | 34 |
| INFINITY WASH XL 1500 | 22 |
| VL3500 SPOT | 6 |
| ATOMIC STROBE | 78 |
| 8LITE | 62 |
| 4LITE | 14 |
| COLORBLAST12 | 184 |
| DRAGONFLYS | 6 |
| JACOBS LADDERS | 5 |
| KRYO JETS | 8 |
| CONFETTI MACHINES | 4 |
| UPSTAGE PIPE GRID (PER DRAWING) | 1 |
| 2FT LED STRIP | 303 |
| JARAG PAR30 (DJ BOOTH) | 21 |
| PIXELLINE 1044 (DJ BOOTH) | 6 |
| 10' X 20.5" BOX TRUSS | 89 |
| 5' X 20.5" BOX TRUSS | 2 |
| POINTS | 103 |
| POWER/DISTRO CABLE PACKAGE | 1 |
| GRANDMA - FULL SIZE W/LITE BACKUP | 1 |
| 34'9" X 23'4" 18MM MESH (UPSTAGE) | 1 |
| 13'10" X 10' 7MM HI RES (OFFSTAGE) | 6 |
| 25'H X 8' X 8' TRIANGLE SCREEN (OFFSTAGE) | 6 |
| 12'6"H X 8' X 8' TRIANGLE SCREEN (OFFSTAGE) | 6 |



**CONFIDENTIAL**

WEG 002189

MEGASTRUCTURE:





**CONFIDENTIAL**

| CARL COX | |
| --- | --- |
| Type | Quantity |
| INTELLASPOT | 18 |
| INFINIT SPOT XL | 44 |
| INFINITI WASH XL | 12 |
| 2LITE BLINDER | 8 |
| ATOMIC STROBE | 22 |
| DLED 60 LED STRIP | 12 |
| PINSPOT BAR (8 UNITS) | 56 |
| LED PAR (4LITE BLINDER - TONERS) | 24 |
| LASER (5W) | 4 |
| FOG MACHINES | 8 |
| HAZE MACHINES | 2 |
| 5 X 20.5' BOX TRUSS | 6 |
| 10' X 20.5' BOX TRUSS | 68 |
| 20.5' BOOKEND HINGE | 12 |
| CUSTOM DJ BOOTH (PER DRAWING) | 1 |
| 20MM VIDEO (3TILES X 8TILES) | 7 |
| GRANDMA - FULL SIZE W/LITE BACKUP | 1 |
| CABLE, DIMMING, DISTRO, HARDWARE | 1 |
| POINTS (LIGHTING) | TBD |
| POINTS (VIDEO) | TBD |
| TRUCKING | 1 |
| LABOR | 1 |

**FOH**

| | |
| --- | --- |
| 24 | Aero 50    Passive 3-way, Full Sized Line Array Speaker |
| 20 | LX 218 CA   PowerSoft Powered Subwwofer |
| 2 | AX-Aero50  Fly Bumpers |
| 1 | Yamaha PM5D w/ Big Ben Word Clock |
| 2 | DSP 4080 Disgital Processors |
| 1 | Power Distribution |
| 1 | 40 x 8 x 300'  Snake |
| 1 | Workbox and Mic Package |
| 1 | Rigging Package Including: 8 CM Motors, Steel, Shackles, etc |

**MONITORS**

| | |
| --- | --- |
| 2 | Sidefills Consisting of:  3) 215a / 4) Aero 8a per side |
| 6 | SML 12a Powered Monitors |
| 2 | DJ Monitor Stach Consisting of: 1)Avant 15a / 1 Avant 118a per stack |

**DELAYS**

| | |
| --- | --- |
| 16 | Aero 12a |
| 8 | LX 215a Powered Subs , (***if Needed***) |
| 4 | AX-215 Combo Bumpers |
| 4 | AX-LX215 Bumpers |
| | |
| 5 | 2 Audio Technicians, per day |
| 5 | Assistant Audio Tech, per day |
| 1 | Transportation to / from jobsite |

**CONFIDENTIAL**

WEG 002191

CROATIA 2012
EXECUTION COPY

**Exhibit E**

| TRAVEL RIDER |
|---|

| Position | Fee | Airfare | Hotel | Transport | Meal Allowance Per Day | Golf Cart |
|---|---|---|---|---|---|---|
| Principal/Executive | €- | Business | 5 Star | 6 Seat SUV + Driver/Translator | € 175 | 6 Passenger |
| Principal/Executive | €- | Business | 5 Star | 6 Seat SUV + Driver/Translator | € 175 | 6 Passenger |
| Principal/Executive | €- | Business | 5 Star | Shared Ultra Bus | € 175 | 4 Passenger |
| Production Director | €15,000.00 | Business | 5 Star | 5 Passenger Sedan | € 175 | Utility |
| Security Director | €500 per day | Coach | 5 Star | n/a | € 100 | 4 Passenger |
| Security | €350 per day | Coach | 5 Star | n/a | € 100 | n/a |
| Festival Prod Designer/LD | €10,000.00 | Business | 5 Star | Shared Ultra Bus | € 100 | Utility |
| Hospitality Director | €5,000.00 | Coach | 5 Star | Shared Ultra Bus | € 100 | 4 Passenger |
| Production Liaison | €7,500.00 | Coach | 5 Star | Shared Ultra Bus | € 100 | Utility |
| Main Stage VJ | €7,500.00 | Business | 5 Star | Shared Ultra Bus | € 100 | n/a |
| Graphic Designer | €5k + $40 p/hour over 125 hours | n/a | n/a | n/a | € 100 | n/a |
| Webmaster | €5k + $40 p/hour over 125 hours | n/a | n/a | n/a | € 100 | n/a |
| Event Host | €2,500.00 | Coach | 5 Star | Shared Ultra Bus | € 100 | 4 Passenger |
| Photographer | €5,000 | Coach | 5 Star | Shared Ultra Bus | € 100 | 4 Passenger |
| Marketing | € - | Coach | 5 Star | Shared Ultra Bus | € 100 | n/a |
| Financial Liaison | € - | Coach | 5 Star | Shared Ultra Bus | € 100 | n/a |

| TERMS AND CONDITIONS |
|---|

(1) **Payment.**  Licensor's traveling personnel shall be paid their travel Expenses hereunder and per diem amounts in full in advance of travel and in accordance with this applicable Annual Travel Rider.  All payments shall be made through **[TO BE DETERMINED BY LICENSOR]** with back-up documentation such as a registered contract together with any applicable rider or addendum. Bank receipts for any Taxes withheld from per diem and compensation payments shall be promptly provided to Licensor.

(2) **Due Dates.**  Licensee shall make all payments in full compensation for services performed by Licensor's personnel, no later than 14 days prior to each applicable Event.

(3) **Post Event Balances.**  Any remaining balances for any additional services, charges, per diem or accommodations shall be paid by Licensee no later than 5 days after invoice by Licensor, but in no event later than the opening of the applicable Event.

(4) **Lodging.**  Licensee shall provide lodging for all Licensor's traveling personnel at a hotel approved by Licensor.  Accommodations shall, at a minimum, include in-room, high-speed, wireless Internet access and all Taxes as well as all ground transportation.

(5) **Air Travel.**  Licensor shall be entitled to select all airlines, flights, and dates of travel in its sole discretion.  Licensee shall timely purchase airline tickets with airline, flight and class of service designated, subject to availability, by Licensor in accordance with Licensor's Travel Rider.

(6) **Ground Transportation.**  Ground transportation shall be provided by Licensee with late model vehicles, insured by Licensee or its designee and approved by Licensor.

(7) **Conflicts.**  In the event of a conflict between the terms of the Agreement and this Travel Rider, the Travel Rider shall control.

Rev. 11/9/2012 (Travel Rider Only)
Rev. 11/2/2012

**CONFIDENTIAL**

WEG 002192

**Exhibit F**

**MEDIA RIGHTS**

TERMS AND CONDITIONS

1. **Defined Terms**. Those defined terms used herein shall have the meaning ascribed to them in the License Agreement

2. **Clearances**. AMM represents and warrants that it shall be solely responsible for obtaining all necessary rights, clearances, licenses, authorizations, title and interest necessary to exploit the UMF Videos as contemplated in the Agreement, including (a) crowd releases; (b) name, image and likeness releases; (c) publishing and master recording licenses, including from local or regional artists, necessary to exploit the UMF Videos in the manner contemplated herein, including to stream the UMF Videos live and to rebroadcast the footage (collectively the "Clearances").

3. **Work Made For Hire**. Ultra shall be the sole and absolute owner of any and all content produced relative to the Event(s) as well as any additional content delivered by Ultra to AMM relative to the Event(s).

   a. _Ownership_. AMM hereby unconditionally and permanently assigns to Ultra all intellectual property rights in and to, the Footage created from inception hereunder, and to any other applicable aspects of the UMF Videos, including the webisodes, outtakes, footage and live event content and any and all respective duplications thereof in whatever form, together with the performances embodied thereon, and the UMF Videos shall be the sole property of Ultra in perpetuity, free from any claim whatsoever by AMM or any other person including, without limitation, all copyrights, trademarks, trade dress and trade secrets which would otherwise be retained by AMM or which falls outside the "work-made-for-hire" doctrine under U.S. Copyright law. If for any reason the results and proceeds of the applicable portion of the UMF Videos, including webisodes, footage, outtakes and live event content are determined at any time not to be a "work made for hire," AMM hereby irrevocably transfers and assigns to Ultra all rights, title and interests therein, including all copyrights, trademarks, trade dress, trade secrets in and to the applicable portions of the UMF Videos, including webisodes, footage, outtakes and live event content as well as, all renewals and extensions thereto, and the right to apply for registration(s) of the copyrights, trademarks and patents for said UMF Videos, including the webisodes, footage, outtakes and live event content with the U.S. Copyright Office, the United States Patent and Trademark Office and all appropriate governmental bodies inside and outside the United States.

   b. _Assignment_. AMM acknowledges and agrees

that the UMF Videos, including webisodes, footage, outtakes and live event content and all United States and foreign copyrights therein and any material object(s) embodied therein are and shall be the sole and exclusive property of Ultra, its successors, assigns, designees or nominees and AMM hereby covenants and irrevocably sells, assigns, transfers and conveys unto Ultra, its successors, assigns, designees, or nominees all rights, title and interests in and to the application portions of the UMF Videos, including webisodes, footage, outtakes and live event content, including all worldwide copyrights therein together with all rights, title and interests therein.

   c. _Right to Register_. AMM acknowledges and agrees that Ultra, its successors, assigns, designee or nominees, shall have the sole, absolute and exclusive right to secure, register in its name or in the name of its successors, assigns, designees or nominees or otherwise perfect all claim(s) to copyright(s) in and to the applicable portions of the UMF Videos, including webisodes, footage, outtakes and live event content and the material objects therein in the United States and throughout the world in Ultra's name or in the name of Ultra's nominee(s). Ultra shall have the exclusive and absolute right to copyright any and all of the UMF Videos, including webisodes, footage, outtakes and live event content in Ultra's name as the owner and author thereof (or in the name of Ultra's successors, assigns, designees, or nominees) to, among other things, secure any and all renewals and extensions of such copyright(s) throughout the world.

   d. _Right To Use_. AMM acknowledges and agrees that Ultra, its successors, assigns, designees or nominees shall have the absolute and exclusive right to use, license, transfer or otherwise dispose of the UMF Videos, including webisodes, footage, outtakes and live event content, all copyrights therein and said material object(s) or copies of same and derivative works based thereon throughout the world in any manner whatsoever without notifying, consulting or accounting to AMM.

   e. _Promotional License_. Ultra hereby grants to AMM a royalty-free, non-exclusive and promotional use license to solely promote the Event(s) (the "Promotional License") in the manner contemplated and expressly set forth herein. Unless otherwise specified by Ultra, the Promotional License shall be limited in territory to those countries, regions, states or cities specified in Exhibit H or in such other manner or territory as determined by Ultra. The Promotional License shall be limited to a term of _____ year(s) which shall

commence on _____ and shall conclude on _____ (if left blank, the duration shall expire 90 days following the Effective Date). AMM shall only use licensed content that has been expressly approved by Ultra prior to AMM's use of said content. AMM acknowledges and agrees that Ultra shall approve of the use of any content publicized by AMM to promote the Event(s) and Ultra shall be the exclusive editor of said content.

f.    No Monetization.  Unless otherwise expressly approved by Ultra, AMM shall not exploit the UMF Videos in such a way that will generate revenue, either directly or indirectly.

g.    Right to Publish.  AMM acknowledges and agrees that Ultra, and any of its subsidiaries, affiliates, licensees or designees shall have, and grant to others, the right to reproduce, print, publish or disseminate in any medium (1) AMM's name, (2) the names, portraits, pictures and likenesses of any person(s) furnished or selected by Ultra and performing Services in connection with the webisodes (including, without limitation, all professional, group, and other assumed or fictitious names used by them), and (3) biographical material concerning them as news or information, for the purposes of trade or for advertising purposes.

h.    Right to Alter.  AMM acknowledges and agrees that Ultra, its successors, assigns, designees or nominees, shall have the sole and exclusive right at its discretion to make or have made, revisions, modifications, alterations, amendments, corrections, updates, expansions, condensations, transformations, transpositions, arrangements, sound recordings, scores, additions to, deletions from or other changes to or derivative works based on the relevant portion of the UMF Videos including webisodes, footage, outtakes and live event content or any portion thereof in any way Ultra may see fit or deem necessary, with or without attribution to AMM and Ultra shall have the right to distribute copies thereto free of any duty, obligation or liability to AMM for payment of any royalties or additional forms of compensation and free of all objections, claims, causes of action or demands by AMM who does hereby expressly, voluntarily, knowingly, absolutely and unconditionally waive and release Ultra as well as its successors, assigns, designees or nominees from same.

i.    No Moral Rights.  AMM hereby acknowledges and agrees that it shall have no so-called moral rights in the UMF Videos, any portion thereof or any derivative work(s) based thereon.

j.    Relinquishment of Rights.  AMM hereby expressly and knowingly relinquishes and waives any and all right(s) to claim authorship of and in the UMF Videos and any portion thereof or any derivative work(s) based thereon.

k.    Cooperation.  AMM shall execute and deliver to Ultra such instruments of transfer and other documents regarding the rights of Ultra in the UMF Videos as Ultra may

reasonably request to carry out the purposes of this Agreement and to perfect Ultra's ownership interests in and to the relevant portions of the UMF Videos.  To that end, AMM hereby appoints Ultra as its attorney-in-fact for purposes of executing any and all documents reasonably necessary to perfect Ultra's ownership interests in the applicable portion of the UMF Videos being created herein and in accordance with the terms expressly stated or contemplated herein. Ultra shall have the unlimited right to exploit the UMF Videos for all purposes by any means now or hereafter developed, and in any form or media whatsoever, under any trademarks, tradenames and labels with no additional compensation payable to AMM. AMM shall use best efforts to execute all documents and take all actions as may be reasonably requested by Ultra to secure, perfect, enforce or otherwise protect Ultra's rights, title and interests in and to said material object(s) and the UMF Videos, including but not limited to all worldwide copyrights therein.

4.    Conflict.  In the event of a conflict between the terms of the Agreement and these Media Rights: Terms and Conditions, these Media Rights: Terms and Conditions shall control.

5.    Limitation of Liability.  AMM acknowledges and agrees that Ultra, its subsidiaries, affiliates, principals, employees and authorized agents shall have no liability to any affiliate of AMM or to any other person for consequential, special, or punitive damages, or any other type of special damages. AMM acknowledges that Ultra shall not be liable to it for any failure to exploit the UMF Videos in whole or in part for any reason, including force majeure events.

6.    Indemnification.  AMM shall defend, indemnify and hold Ultra, its subsidiaries, affiliates, parents and authorized agents (the "Ultra Indemnitees") harmless for any losses, judgments, damages or claims sustained by Ultra Indemnitees.

7.    Insurance.  AMM shall procure and maintain General Liability and Errors and Omissions insurance, which covers general commercial liability as well as production and exploitation of the film with minimum limits of $1,000,000 per occurrence and $3,000,000 aggregate. Ultra, its subsidiaries, affiliates, principals, employees and authorized agents shall be named as an additional insured on AMM's insurance. AMM shall provide proof of insurance upon request by Ultra.

**CONFIDENTIAL**

WEG 002194

## Exhibit G

### REFUND PROGRAM REQUIREMENTS

1. **Refund Program.** AMM shall develop, maintain, administer and implement, at AMM's sole cost and expense, a comprehensive Refund Program that shall be subject to the approval of Ultra and which shall be compliant with Applicable Laws. Ultra shall have the right to require changes to the Refund Program from time to time during the Term of this Agreement.

2. **24-Hour Implementation.** AMM shall, within 24-hours of an Event cancellation, implement the approved Refund Program in accordance with Applicable Laws and Ultra guidelines. The Refund Program shall correspondingly require all ticketing companies, banks, settlement agents, merchant intermediaries, facilitators, independent ticket sellers, where applicable, to implement AMM's refund policy within 24 hours of notification of an Event cancellation by either AMM or Ultra.

3. **Ticket Sellers.** AMM shall provide to Ultra and shall maintain an updated list of, and contact information for, all ticket companies and outlets relative to the Event. AMM shall provide Ultra with copies of all executed ticketing agreements, if available and shall have a continuing obligation to provide Ultra with all amendments to such ticketing agreements and shall also maintain updated lists of independent ticket sellers, if any. In cases where written agreements do not exist, AMM shall provide Ultra with a written description of the terms of the applicable ticketing arrangement.

4. **Refunding**. AMM shall provide to Ultra, written refund policies—in English and in the native language of the Territory—specifically addressing the procedures for each payment method accepted including cash, credit cards, bank transfers, gift cards and other forms of tender. The Refund Program shall, subject to the applicable ticketholder terms and conditions, provide for the automatic refunds to ticket holders as follows: (a) credit card purchasers shall be entitled to automatic refunds, credits, chargebacks, or charge reversals and other dispute resolution remedies upon the cancellation of an Event; (b) cash purchasers shall be entitled to obtain refunds from their original points of sale; and (c) bank and wire transfer customers shall be entitled to automatic refunds, credits, chargeback equivalents, payment or wire reversals and other dispute resolution remedies.

5. **Notifications.** AMM shall publish and distribute AMM's refund procedures in the form and medium specified by Ultra including on applicable Event websites. Ultra shall have the right to approve all public notifications including notifications on AMM's website and its social media outlets. All refund notifications shall include detailed step-by-step instructions on how to obtain a refund and the estimated timeframe for such refunds.

6. **Time frame.** Unless otherwise permitted by Applicable Laws, all refund requests shall be processed within 14 days.

7. **Customer Services**. Within 24 hours of an Event cancellation, AMM shall set up and maintain a customer service program to assist ticket holders and to manage ticketholder refunding inquiries. The customer service program shall include telephone numbers and e-mails. All telephone numbers shall be toll-free.

**CONFIDENTIAL**

WEG 002195

## Exhibit H

### TERRITORY OF EUROPE

| Current European Union Member States | European Union Candidate Countries | Potential European Union Candidate Countries |
|---|---|---|
| Australia | The former Yugoslav Republic of Macedonia | Bosnia-Herzegovina |
| Belgium | Iceland | Kosovo |
| Bulgaria | Montenegro | |
| Cypress | Serbia | |
| Czech Republic | Turkey | |
| Denmark | | |
| Estonia | | |
| Finland | | |
| France | | |
| Germany | | |
| Greece | | |
| Hungary | | |
| Ireland | | |
| Italy | | |
| Lazio | | |
| Lithuania | | |
| Luxenberg | | |
| Malta | | |
| Netherlands | | |
| Polenta | | |
| Portugal | | |
| Romania | | |
| Slovakia | | |
| Sylvania | | |
| Spain | | |
| Sweden | | |
| United Kingdom | | |

**CONFIDENTIAL**

WEG 002196